

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-18-2003

# Schneider v. Fried

Precedential or Non-Precedential: Precedential

Docket 01-3786

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

## Recommended Citation

"Schneider v. Fried" (2003). *2003 Decisions.* Paper 776.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/776

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed February 18, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-3786

ERIC SCHNEIDER, as Personal
Representative of the Estate of
Anne B. Schneider and the
ESTATE OF ANNE B. SCHNEIDER,

    Appellants

v.

GORDON W. FRIED, D.O., POCONO
CARDIOLOGY ASSOCIATES, P.C. and
ST. LUKE'S HOSPITAL

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civ. No. 98-cv-5878)
Magistrate Judge: Honorable Arnold C. Rapoport

Argued: December 18, 2002

Before: BECKER, Chief Judge, ROTH and
ROSENN, Circuit Judges.

(Filed: February 18, 2003)

RICHARD OARE, ESQUIRE
 (ARGUED)
1434 South George Street
York, PA 17403

Counsel for Appellants


JOHN J. HARE, ESQUIRE
 (ARGUED)
Marshall, Dennehey, Warner,
 Coleman & Goggin
1845 Walnut Street
16th Floor
Philadelphia, PA 19103

Counsel for Appellees

OPINION OF THE COURT

BECKER, Chief Judge:

This is a medical malpractice case predicated on our
diversity jurisdiction and brought under Pennsylvania law.

Eric Schneider ("Schneider") sued on behalf of the estate of his mother, Anne B. Schneider, alleging that Mrs. Schneider's death resulted from malpractice by defendant Gordon W. Fried, D.O. ("Dr. Fried") that occurred while she was being treated for a heart condition. Mrs. Schneider's estate is also a plaintiff in this case. Plaintiffs appeal from the Magistrate Judge's grant of a dispositive motion at the conclusion of plaintiffs' case after he had excluded the testimony, following a Daubert hearing, of plaintiffs' two medical experts who testified that Dr. Fried violated the applicable standard of care by administering the drug Procardia sublingually to Mrs. Schneider as a pretreatment for an angioplasty.

Both proffered experts, Marc Semigran, M.D. ("Dr. Semigran") and Gregg Reis, M.D. ("Dr. Reis") possessed eminent academic credentials. Dr. Semigran's testimony was excluded because the literature he cited at trial as informing his opinion did not address the use of Procardia to prevent coronary spasm during an angioplasty, the specific use in this case. It also appears that another basis for the exclusion of Dr. Semigran's testimony (a point relied upon heavily by defendants) was that he no longer practiced in the sub-specialty area at issue in the case: interventional cardiology; an interventional cardiologist performs surgical procedures, while Dr. Semigran had

2

become an invasive cardiologist, who diagnoses and treats heart conditions. The Magistrate Judge excluded the testimony of Dr. Reis because he stated, at one point in his testimony, that he was opining about his own personal standard of care and not the standard of care in the medical field.

As plaintiffs argue, however, the basis of the Magistrate Judge's ruling was undermined by strong countervailing evidence supporting admission of the testimony of both experts. Dr. Semigran, a former interventional cardiologist, testified that his opinion was not based solely on the literature he cited, but also on his broad knowledge of heart conditions and his own experience, albeit as an invasive cardiologist, making recommendations to interventional cardiologists about which drugs to prescribe to patients undergoing angioplasties; indeed, Dr. Semigran was present during surgical procedures performed by interventional cardiologists and would advise the interventional cardiologists throughout those procedures. Likewise, Dr. Reis testified extensively about the standard of care in the medical field and explained in a sworn affidavit that his previous statement to the effect that he could only discuss his own personal standard of care was in response to a question that he misunderstood.

We conclude that the Magistrate Judge abused his discretion in excluding the testimony of both experts. There is no dispute that Dr. Semigran's testimony was based in part on his considerable professional experience, including

advising interventional cardiologists during surgical procedures. This makes his testimony about the standard of care reliable, even if the literature he cited was irrelevant. And in view of his extensive experience working closely with interventional cardiologists, Dr. Semigran is also qualified to give expert testimony, even though he is an invasive cardiologist. We also conclude that Dr. Reis' expert testimony should have been admitted. Dr. Reis gave ample testimony about the standard of care in the medical field before he stated that he could only testify about his own personal standard of care. Since the defendants offer no evidence or explanation to suggest that Dr. Reis did not misunderstand the question, we conclude that Dr. Reis was

3

qualified to give expert testimony. Accordingly the judgment will be reversed and the case remanded for a new trial.

Before addressing the evidentiary issues, we must first take up a challenge to our appellate jurisdiction. Although the notice of appeal to this Court was untimely (a motion for a new trial submitted beyond the ten day period required by Rule 59 of the Federal Rules of Civil Procedure does not toll the period for filing an appeal), we apply the "unique circumstances" doctrine. Under the doctrine, we have jurisdiction to hear the untimely appeal because the late filing was induced by the Magistrate Judge's order, which conferred upon plaintiffs "the right" (albeit impermissibly) to file a second notice of appeal within thirty days of receiving the trial transcript and the plaintiffs relied upon that order.

I.

Anne Schneider was admitted to the Pocono Medical Center on November 10, 1996, where she was diagnosed with unstable angina. Mrs. Schneider's blood pressure was falling, even after intravenous nitroglycerin was initiated, and she was transferred to St. Luke's Hospital, in Bethlehem, Pennsylvania. At that time, a cardiac catheterization was performed by Dr. Fried, revealing that a coronary angioplasty was necessary. Mrs. Schneider was thus scheduled to have an angioplasty performed by Dr. Fried at St. Luke's Hospital. As a pre-treatment, given before undergoing the angioplasty, Dr. Fried administered ten milligrams of the drug Procardia (also known as nifedipine) sublingually (under the tongue). The purpose of the Procardia was to prevent coronary spasm during the angioplasty; a drug administered sublingually is more quickly absorbed into the body and takes effect rapidly.

Soon after the Procardia was administered, Mrs. Schneider's blood pressure decreased rapidly (she became hypotensive). Dr. Fried administered drugs in an attempt to increase her blood pressure. Dr. Fried began the angioplasty some 20 to 30 minutes after Mrs. Schneider initially became hypotensive. The angioplasty was performed, but Mrs. Schneider became unresponsive. An

analgesic was administered, but Mrs. Schneider remained
seriously hypotensive. The next day, an echocardiogram
showed persistent right ventricular dysfunction. In short
sequence, Mrs. Schneider developed end-organ dysfunction,
including renal failure and progressive cardiogenic shock.
Her blood pressure fell and she died on November 13,
1996. The post-mortem exam showed acute myocardial
infarction of the right ventricle and left ventricular posterior
wall.

Eric Schneider and the estate of Anne Schneider brought
suit in the District Court for the Eastern District of
Pennsylvania against Dr. Fried, Pocono Cardiology
Associates, P.C. and St. Luke's Hospital for medical
malpractice. With the consent of the parties and pursuant
to 28 U.S.C. S 636(c)(1), this case was heard before a
Magistrate Judge. See 28 U.S.C. S 636(c)(1) (providing that
upon consent of the parties, a magistrate judge"may
conduct any or all proceedings in a jury or nonjury civil
matter and order the entry of judgment in the case").
Plaintiffs based the medical malpractice claim on two
theories: (1) Dr. Fried violated the applicable standard of
care by administering sublingual Procardia to Mrs.
Schneider as a pre-treatment for the angioplasty; and (2) he
waited too long to perform the angioplasty once Mrs.
Schneider became hypotensive. In support of the case, the
plaintiffs presented the expert testimony of Doctors
Semigran and Reis. As noted above, the Magistrate Judge
excluded that testimony.

On April 27, 2001, at the conclusion of the plaintiffs'
evidence, the Magistrate Judge granted the defendants'
motion to dismiss, alleging that the plaintiffs had not set
forth a prima facie case for medical malpractice because
they had not presented the testimony of at least one expert
who could state with a reasonable degree of medical
certainty that the acts of the defendant-physician deviated
from the standard of reasonable medical care, and that
such deviation was the proximate cause of the harm
suffered. Maurer v. Trustees of the University of
Pennsylvania, 418 Pa.Super. 510, 516, 614 A.2d 754, 757
(1992) (citing Mitzelfelt v. Kamrin, 526 Pa. 54, 62, 584 A.2d

888, 892 (1990)). The motion was apparently brought
pursuant to Rule 50 of the Federal Rules of Civil Procedure.1

The plaintiffs did not file a notice of appeal at that
juncture, instead filing a motion for a new trial on May 8,
2001. However, plaintiffs' counsel failed to order a copy of
the trial transcript along with the motion for a new trial.
See E.D. Pa. Loc. R. Civ. P. 7.1(e) ("Within fourteen (14)
days after filing any post-trial motion, the movant shall
either (a) order a transcript of the trial by a writing

delivered to the Court Reporter Supervisor, or (b) file a verified motion showing good cause to be excused from this requirement. Unless a transcript is thus ordered, or the movant excused from ordering a transcript, the post-trial motion may be dismissed for lack of prosecution.").

Because counsel had failed to order the trial transcript, the Magistrate Judge entered an order on June 29, 2001 denying the plaintiffs' motion for a new trial. At the same time, however, the Magistrate Judge gave the plaintiffs the opportunity to file a second motion for a new trial within thirty days of receiving the trial transcript:

> [I]t is hereby ORDERED that Plaintiff 's motion is DENIED with the right of the Plaintiff to bring a Motion for a New Trial together with a Brief in Support of the Motion for a New Trial within thirty (30) days from receipt of the trial transcript.

On July 19, 2001, the defendants filed a praecipe asking the Magistrate Judge to mark the matter closed based on the failure to timely order a copy of the trial transcript. On August 16, 2001, the plaintiffs filed a brief in reply to the praecipe, requesting that they be granted until August 30, 2001 to file the motion for a new trial. On August 30, 2001, the plaintiffs filed a second motion for a new trial, having

_____

1. The Magistrate Judge did not specify that he was granting judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure. Instead, he simply stated in his order of April 27, 2001 that he was granting defendants' motion for dismissal. Because it appears that the Magistrate Judge was entering judgment for the defendants because "there is no legally sufficient evidentiary basis for a reasonable jury to find for the party on that issue," we conclude that the case was dismissed pursuant to Fed. R. Civ. P. 50.

6

complied with the Magistrate Judge's order granting them thirty days from receipt of the trial transcript to file a second motion for a new trial (the plaintiffs received the trial transcript on July 30, 2001.) On September 13, 2001, the Magistrate Judge denied the plaintiffs' second motion for a new trial, and concluded that the praecipe was moot. The plaintiffs filed a notice of appeal to this Court on October 5, 2001.

II.

Rule 4(a)(1)(A) of the Federal Rules of Appellate Procedure requires that an appellant file a notice of appeal within thirty days after the judgment of order appealed from is entered. Although the Magistrate Judge dismissed the plaintiffs' case on April 27, 2001, they would have more than thirty days from the dismissal to file a notice of appeal with this Court if the motion for a new trial was timely filed. See Fed. R. App. P. 4(a)(4)(A) ("If a party timely files [for a new trial under Rule 59] in the district court . . . the time

to file an appeal runs for all parties from the entry of the order disposing of the last . . . remaining motion."). At first glance, the plaintiffs would appear to have complied with the requirement that they file a notice of appeal within thirty days from the final order; the final order in this case, the order denying the plaintiffs' second motion for a new trial, was entered on September 13, 2001 and they filed a notice of appeal on October 5, 2001.

However, under Fed. R. Civ. P. 59(b), "[a]ny motion for a new trial shall be filed not later than 10 days after the entry of the judgment." Moreover, Fed. R. Civ. P. 6(b) states that a district court "may not extend the time for taking any action under . . . 59(b) . . . except to the extent and under the conditions stated in [59(b)]." Although sanctioned by the Magistrate Judge, the defendants argue that the second motion for a new trial was untimely, and as such it "did not toll the 30-day time period for filing notices of appeal." Kraus v. Consolidated Rail Corp., 899 F.2d 1360, 1362 (3d Cir. 1990). Thus, the defendants submit, the plaintiffs were required to file a notice of appeal within thirty days of June

29, 2001, when the Magistrate Judge denied the timely motion for a new trial, which they did not do.[2]

The Magistrate Judge did not have the jurisdiction to allow the plaintiffs to file a second motion for a new trial more than ten days after dismissing the case. In so concluding, we note that "[t]he 10-day filing period [contained in Rule 59] is mandatory and jurisdictional, and may not be extended by the court . . . stated differently, a district court lacks jurisdiction to grant an untimely motion." 12 Moore's Federal Practice S 59.11[1][a] (3d ed. 2002) (citing Sonnenblick-Goldman Corp. v. Nowalk, 420 F.2d 858, 860 (3d Cir. 1970) ("Rule 6(b) [of the Federal Rules of Civil Procedure] has been determined to render a court without power to extend the time for service of motions.")). Rule 6(b) of the Federal Rules of Civil Procedure clearly forbids a district court from extending the ten day time period in Rule 59(b). See Fed. R. Civ. P. 6(b) ("[T]he court . . . may not extend the time for taking action under . . . 59(b) . . . except to the extent and under the conditions stated in [59(b)]."). Thus, the plaintiffs were required to file a notice of appeal from the disposition of the last timely filed motion; the Magistrate Judge denied the plaintiffs' timely motion for a new trial on June 29, 2001. Since they did not file a notice of appeal until October 5, 2001 --

_____

2. The defendants also appear to argue that we do not have jurisdiction to hear this appeal because Schneider violated Local Rule of Civil Procedure 7.1(e) by not ordering the trial transcript within fourteen days of filing a post trial motion, or showing good cause for being excused from this requirement. However, Rule 7.1(e) gives the district court discretion to excuse this requirement:

     Within fourteen (14) days after filing any post-trial motion, the

> movant shall either (a) order a transcript of the trial by a writing
> delivered to the Court Reporter Supervisor, or (b) file a verified
> motion showing good cause to be excused from this requirement.
> Unless a transcript is thus ordered, or the movant excused from
> ordering a transcript, the post-trial motion may be dismissed for lack
> of prosecution. E.D. Pa. Loc. R. Civ. P. 7.1(e) (emphasis added).

Under the local rule, the Magistrate Judge was not required to dismiss
the plaintiffs' motion for a new trial simply because counsel did not
order a copy of the trial transcript.

beyond the thirty day requirement -- the plaintiffs' appeal
is untimely.

However, the Supreme Court has created a narrow
exception to the requirement that the notice of appeal be
filed within thirty days of the disposition of the last timely
motion. See Thompson v. INS, 375 U.S. 384, 387 (1964)
(remanding to the Court of Appeals, which had dismissed
the appeal as untimely, "in view of these 'unique
circumstances' "). The doctrine of "unique circumstances"
permits an untimely Rule 59 motion to extend the time for
filing an appeal when the party filed a late appeal in
reliance on the actions of the district court. The unique
circumstances doctrine is explained in Moore's Federal
Practice:

> Occasionally a district court will erroneously enlarge
> the filing period for Rule 59 . . . motions against the
> prohibition against enlargement in Rule 6(b). Under the
> doctrine of unique circumstances, if a party performs
> an act that, when properly performed, would extend
> the deadline for filing an appeal and the party
> reasonably relies on the district court's conclusion that
> the act was properly performed, an otherwise late
> appeal is timely if filed within the mistakenly enlarged
> deadline. 12 Moore's Federal Practice S 59.12[2][b] (3d
> ed. 2002).

This Court has acknowledged the continued viability of
the unique circumstances doctrine in Kraus, concluding
that "[t]he unique circumstances exception evolved out of
concern with the fairness of a dismissal when the district
court contributed to the party's failure to take the steps
necessary to perfect the appeal." 899 F.2d at 1365. In
Kraus, we did not allow the appellant to take advantage of
the doctrine of unique circumstances because the filing
delay was partly due to the attorney's own incompetence.
See id. ("The unique circumstances doctrine has never been
extended to an attorney's miscalculation of the applicable
time limits."). In contrast, in the case at bar, the appeal
was untimely solely because of the plaintiffs' reliance on the
order of the Magistrate Judge.

It is arguable that counsel should have realized that the
Magistrate Judge exceeded his authority by allowing the

plaintiffs to file a second motion for a new trial more than ten days after the case was dismissed and that counsel should have filed a notice of appeal immediately after the Magistrate Judge denied the first motion for a new trial to preserve the appeal. However, where the Magistrate Judge misunderstood his own authority to grant an extension to the ten day filing period contained in Rule 59(b), and conferred upon plaintiff "the right" to an extension, it would be a harsh result to require the plaintiffs to question the Magistrate Judge's power to do so. The unique circumstances doctrine was designed for situations such as this, to prevent the appellant's reliance on the district court's mistake from prejudicing the appellant.

The plaintiffs clearly relied on the Magistrate Judge's order granting them until thirty days after receiving the trial transcript to file a second motion for a new trial. The plaintiffs also complied with the Magistrate Judge's (erroneously) enlarged deadline; they received the trial transcript on July 30, 2001 and filed the second motion for a new trial on August 30, 2001. Thus, because we conclude that the plaintiffs reasonably relied upon the Magistrate Judge's order conferring upon them "the right" to file a second motion for a new trial more than ten days after the case was dismissed, the doctrine of unique circumstances gives us jurisdiction to hear the appeal even though the notice of appeal was untimely. We thus proceed to the merits of the appeal.

III.

We review the decision to admit or reject expert testimony under an abuse of discretion standard. In re Paoli Railroad Yard PCB Litigation, 35 F.3d 717, 749 (3d Cir. 1994). An abuse of discretion arises only when the decision"rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." Oddi v. Ford Motor Co., 234 F.3d 136, 146 (3d Cir. 2000) (citing Hanover Potato Products, Inc. v. Shalala , 989 F.2d 123, 127 (3d Cir. 1993)).

The plaintiffs contend that the Magistrate Judge erred when he excluded the testimony of Dr. Semigran and Dr.

Reis. Rule 702 of the Federal Rules of Evidence allows a witness qualified as an expert to give testimony that would be otherwise impermissible:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon

> sufficient facts or data, (2) the testimony is the product
> of reliable principles and methods, and (3) the witness
> has applied the principles and methods reliably to the
> facts of the case.

Fed. R. Evid. 702.

We have explained that Rule 702 embodies a trilogy of
restrictions on expert testimony: qualification, reliability
and fit.3 Paoli II, 35 F.3d at 741-743 (citing Daubert v.
Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)).
Qualification refers to the requirement that the witness
possess specialized expertise. We have interpreted this
requirement liberally, holding that "a broad range of
knowledge, skills, and training qualify an expert." Id.
Secondly, the testimony must be reliable; it "must be based
on the 'methods and procedures of science' rather than on
'subjective belief or unsupported speculation'; the expert
must have 'good grounds' for his on her belief. In sum,
Daubert holds that an inquiry into the reliability of
scientific evidence under Rule 702 requires a determination
as to its scientific validity." Paoli II, 35 F.3d at 742 (quoting
Daubert, 509 U.S. at 590). Finally, Rule 702 requires that
the expert testimony must fit the issues in the case. In
other words, the expert's testimony must be relevant for the
purposes of the case and must assist the trier of fact. The
Supreme Court explained in Daubert that"Rule 702's
'helpfulness' standard requires a valid scientific connection

---

3. Indeed, Rule 702 of the Federal Rules of Evidence was amended to
include the trilogy of restrictions (qualifications, reliability, fit) in its text
after the Supreme Court decided Daubert. Fed. R. Evid. 702 advisory
committee's notes.

11

to the pertinent inquiry as a precondition to admissibility."
509 U.S. at 591–92.

By means of a so-called "Daubert hearing," the district
court acts as a gatekeeper, preventing opinion testimony
that does not meet the requirements of qualification,
reliability and fit from reaching the jury. See Daubert, 509
U.S. at 592 ("Faced with a proffer of expert scientific
testimony, then, the trial judge must determine at the
outset, pursuant to Rule 104(a) [of the Federal Rules of
Evidence] whether the expert is proposing to testify to (1)
scientific knowledge that (2) will assist the trier of fact to
understand or determine a fact in issue."). The plaintiffs
maintain that the Magistrate Judge abused this discretion
as a gatekeeper by excluding the testimony of experts who
qualified under Rule 702.

A.

The plaintiffs contend that the Magistrate Judge erred
when he precluded the testimony of Dr. Semigran on the
grounds that the literature cited by him as a basis for his

opinion did not address the specific issue in the case: whether it was the standard of care in November of 1996 to administer Procardia sublingually as a pre-treatment for an angioplasty. Instead that literature only addressed the use of Procardia as a treatment for hypertensive emergencies (abnormally high blood pressure) or other blood-pressure problems, which the parties conceded was not the use in this case. Dr. Semigran testified:

> In the way they were administered in this case, I don't believe that sublingual administration of nifedipine was used, at least, according to the standard of care that I understand it to be in November of 1996.
>
> . . .
>
> I think the basis for that statement is my knowledge of the pharmacology -- of the way the agent works, the -- my experience with it and the published literature on it.
>
> . . .

12

> There was certainly published data as early as 1987 of the adverse consequences of administering sublingual nifedipine to patients who were having acute coronary syndromes. There was further information that was published in one of the leading medical journals in 1996 as to the adverse affects of administering sublingual nifedipine to patients. . . . And in addition, the -- the product information that comes along with -- with Procardia nifedipine specifically points out the dangers -- potential dangers -- of using it in patients, who have severe coronary stenosis.

Dr. Semigran admitted on cross-examination that the literature just cited did "not specifically address the issue of vessel spasm." In the case at bar, Procardia was administered as a pre-treatment for an angioplasty-- to prevent coronary vessel spasm during the surgical procedure. The Magistrate Judge precluded Dr. Semigran's testimony, noting that "the literature of the profession upon which the doctor makes his decision" does not address the specific issue.

The ruling by the Magistrate Judge appears to address the second requirement of the Rule 702 trilogy: reliability. This Court has laid out some factors that a district court should consider when determining whether proposed expert testimony is reliable:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique

to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses. Paoli II, 35 F.3d at 742 n. 8 (citing Daubert, supra, and United States v. Downing, 753 F.2d. 1224 (3d Cir. 1985), for these factors).

The defendants maintain that the Magistrate Judge was correct to exclude Dr. Semigran's testimony because the articles do not show that the practice of not administering

Procardia for this purpose (as a pre-treatment) had been subjected to peer review or that the discontinuation of Procardia to prevent coronary vessel spasm had gained general acceptance (two of the Daubert factors).

Without delving into the question whether articles discussing the use of Procardia for one purpose are relevant to whether it was a violation of the standard of care to administer it for another purpose, we note that expert testimony does not have to obtain general acceptance or be subject to peer review to be admitted under Rule 702. Indeed, in Daubert, the Supreme Court specifically held that Rule 702 overruled the requirement that an opinion must gain general acceptance in order to qualify as admissible expert testimony; instead general acceptance and peer review are only two of the factors that a district court should consider when acting as gatekeeper. See Daubert, 509 U.S. at 589 ("Given the [Federal Rules of Evidence's] permissive backdrop and their inclusion of a specific rule on expert testimony that does not mention " 'general acceptance,' " the assertion that the Rules somehow assimilated [United States v. Frye , 293 F. 1013 (D.C. Cir. 1923)] is unconvincing. Frye made "general acceptance" the exclusive test for admitting expert scientific testimony."). Where there are other factors that demonstrate the reliability of the expert's methodology, an expert opinion should not be excluded simply because there is no literature on point.

In the case at bar, Dr. Semigran stated that he based his opinion not only upon the literature, but also upon his own experience as a cardiologist.4 Although Dr. Semigran had

_____

4. Dr. Semigran attended Harvard College and Harvard Medical School. He did an internal medicine residency from 1983 to 1986 at Massachusetts General Hospital, which is affiliated with Harvard Medical School. Dr. Semigran also had a cardiology fellowship at Massachusetts General Hospital following his residency there. From 1989 until the time of trial, Dr. Semigran taught at Harvard Medical School, where he received numerous distinguished teaching awards. As part of his teaching job, Dr. Semigran lectured medical students, residents and fellows in cardiology and supervised residents and fellows in cardiology and the care of patients. Dr. Semigran has served on the Harvard

not actually performed angioplasties since mid-1990, at the time he testified, he was treating patients with angina in his capacity as an invasive cardiologist. The record establishes that as an invasive cardiologist, who normally diagnoses heart conditions, Dr. Semigran was routinely present during surgical procedures and regularly advised interventional cardiologists during the course of those procedures. Dr. Semigran also testified that he would consult with interventional cardiologists about which drugs should or should not be given to patients undergoing angioplasties. Thus, we conclude that Dr. Semigran's experience renders his testimony reliable, demonstrates that his testimony is based on "good grounds," and that the Magistrate Judge abused his discretion by excluding it. See Daubert, 509 U.S. at 590 ("Proposed testimony must be supported by appropriate validation -- i.e., 'good grounds.' ").

Although not specifically mentioned by the Magistrate Judge, the defendants contend that Dr. Semigran's testimony was properly excluded because he was not an expert in the sub-specialty about which he opined. 5 The

---

Medical School admissions committee, a regional review board of cardiac transplantation, a committee that oversees intensive care units at Massachusetts General Hospital, as well as various other committees. At the time he testified, he was a member of the American College of Cardiology, a fellow of the American College of Cardiology, a member of the American Heart Association, and a member of the Heart Failure Society. Dr. Semigran researches "heart failure and . . . the function of the heart when it is failing."

5. The defendants' argument that Dr. Semigran was unqualified to testify because he is not a practitioner of the sub-specialty (interventional cardiology) at issue in the case is also based upon Pennsylvania state law. The defendants state in their brief:

> [T]he Pennsylvania Legislature recently enacted more stringent requirements for all expert witnesses testifying on the standard of care issue in medical malpractice cases. See Medical Care Availability and Reduction of Error Act, 2002 Pa. ALS 13 (2002). Under the M-Care Act, it is necessary for an expert testifying on the standard of care issue to be substantially familiar with the applicable standard of care at the time the alleged breach occurred.

15

tenor of the Magistrate Judge's ruling is consistent with this argument. In particular, the defendants assert that because, in 1996, Dr. Semigran was an invasive cardiologist (diagnosing and treating heart conditions) and not an interventional cardiologist (performing angioplasties) he was not qualified to testify about the standard of care for interventional cardiologists. This argument appears to challenge the qualification of Dr. Semigran; although we note that "the degree to which the expert testifying is

qualified" also implicates the reliability of the testimony. Paoli II, 35 F.3d at 742.

The defendants refer us to our decision in Aloe Coal Co. v. Clark Equip. Co., 816 F.2d 110,114 (3d Cir. 1987), in which we held that a tractor salesman was not qualified to testify about the causes of a tractor fire because"[h]e had no knowledge or experience in determining the cause of equipment fires." However, Dr. Semigran had ample experience advising interventional cardiologists about which drugs to prescribe patients undergoing angioplasties. Moreover, Dr. Semigran's academic background and his teaching position, as noted in the margin, also demonstrate that he is highly knowledgeable about cardiology. For the same reasons that we found Dr. Semigran's testimony reliable -- most importantly because he had regular contact with and advised interventional cardiologists in November of 1996 -- we also conclude that Dr. Semigran had the proper qualifications to give expert opinion, especially considering that the requirement that a witness have specialized knowledge has been interpreted liberally. Paoli II, 35 F.3d at 741. In sum, the Magistrate Judge abused his discretion in excluding Dr. Semigran's testimony.

B.

The plaintiffs also maintain that the Magistrate Judge abused his discretion when he excluded the expert

---

> The expert must also practice in the same subspecialty as the defendant or in a subspecialty which has substantially the same standard of care for the specific care at issue.

However, because the M-Care Act was not enacted until 2002, the Magistrate Judge could not have relied upon it to exclude Dr. Semigran's testimony when the case was dismissed on April 27, 2001.

16

testimony of Dr. Reis. Based on Dr. Reis' statement that "I can't comment on what individual cardiologists were doing throughout the country . . . I can only comment about . . . my practice," the Magistrate Judge concluded that Dr. Reis could not testify about the legal standard of care since an opinion about the legal standard of care must be based on what is considered reasonable and acceptable in the entire community, not just the expert's own practice. See McPhee v. Reichel, 461 F.2d 947, 951 (3d Cir. 1972) (concluding that a jury charge explaining the standard of care should state that a specialist "is expected to exercise that degree of skill, learning and care normally possessed and exercised by the average physician in the medical community who devotes special study and attention" to the diagnosis and treatment of diseases within that specialty). See also Maurer, 614 A.2d at 763 (granting judgment n.o.v. to the defendant since the proposed expert "did not testify to anything more than his own, personal standard of care").

However, in the case at bar, Dr. Reis testified extensively about the general standard of care. For example, he explained:

> My opinion is that at the time this procedure was performed, that a physician doing these procedures should have known that administration of sublingual Procardia could be dangerous. That the information was available, widely published in terms of adverse reactions, both in the prescribing information and in the medical literature. And that a physician doing the procedure should at that point have stopped using sublingual Procardia.
>
> I think the second breach of care was in the failure to recognize that a severe adverse reaction was occurring and failing to act quickly enough to reverse the effects of that adverse reaction by appropriately administering medications to rapidly bring up the blood pressure. Those medications were administered but they were administered too slowly and too late.
>
> And I believe that the third breach of care was that it took too long to perform angioplasty when the emergency situation was developing.

17

On re-direct examination, Dr. Reis made the comment that he could only testify about his own personal standard of care in response to the following question posed by plaintiffs' counsel:

> [W]ith respect to what interventional cardiologists were doing in 1996, is it fair to say that the use of sublingual Procardia, in the fashion in which Dr. Fried used it here, was well below the minimum standard of care by interventional cardiologists throughout the country?

Dr. Reis responded:

> I can't comment on what individual cardiologists were doing throughout the country because . . . frankly, I don't know what each individual cardiologist was doing at the time. You know what I can only comment about was my practice -- my interpretation of the literature and my feelings and how the literature should have been applied to clinical practice.

Counsel for plaintiffs explained to the Magistrate Judge that Dr. Reis thought that counsel had asked him to comment on what individual cardiologists were doing in 1996, and not what interventional cardiologists were doing in 1996. As such, Dr. Reis responded that he did not know what each "individual" cardiologist was actually doing at the time.

Counsel for plaintiffs also requested that the Magistrate

Judge ask Dr. Reis about the misunderstanding while he was still under oath:

> Your Honor, when I addressed you and said that the doctor misunderstood the term "interventional" for "individual," he affirmatively nodded. You might ask the doctor that. He misunderstood the term to mean "individual."

The record shows that the Magistrate Judge refused to let Dr. Reis explain the misunderstanding and proceeded to exclude his testimony because "I don't believe at this juncture that he misunderstood." Dr. Reis later swore in an affidavit that he "misheard [counsel's question], thinking he used the term individual rather than interventional," and

18

"responded to [his] question by using the term individual cardiologist."

We conclude that Dr. Reis' testimony (before making the comment that he could only testify about his practice) demonstrated that he had formed an opinion about the legal standard of care and that the opinion had a reliable basis. For example, Dr. Reis gave ample testimony about what "a physician" should have known and how "a physician" should have acted, see discussion supra. Moreover, Dr. Reis' qualifications suggest that he would be able to testify about the standard of care in the medical field. Dr. Reis is an interventional cardiologist at Pennsylvania Hospital in Philadelphia, where he routinely performs procedures such as catheterizations and angioplasties. He is also a clinical assistant professor at the University of Pennsylvania and the author of a chapter in a text book titled, Cardiac Catheterizations Angiography and Intervention (4th ed.). The defendants have offered no evidence or explanation suggesting that Dr. Reis did not misunderstand the question, and in light of Dr. Reis prior testimony about the standard of care in the medical field, it appears that Dr. Reis was qualified to give expert testimony and that his opinion was based on "good grounds." Daubert, 509 U.S. at 590. Thus, we conclude that the Magistrate Judge abused his discretion by excluding Dr. Reis' testimony.

IV.

For the foregoing reasons, we will reverse the Magistrate Judge's order dismissing the case and will remand for a new trial.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

19