**DENZIL I. STEVENS, Appellant/Defendant**
**v.**
**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff**

S. Ct. Crim. No. 2010-0001

Supreme Court of the Virgin Islands

June 22, 2011

BRUCE W. STREIBICH, ESQ., Law Offices of Bruce W. Streibich, St. Thomas, USVI, *Attorney for Appellant*.

TIFFANY V. MONROSE, ESQ., Assistant Attorney General, V.I. Department of Justice, St. Thomas, USVI, *Attorney for Appellee*.

HODGE, *Chief Justice*; CABRET, *Associate Justice*; MOORE, *Designated Justice*.

## OPINION OF THE COURT

(June 22, 2011)

CABRET, J. Jahlil Ward was the victim of a drive-by shooting in Cruz Bay, St. John. The People charged Denzil Stevens with the shooting and following trial, a jury found Stevens guilty. Stevens appealed the verdict, challenging the sufficiency of the evidence and the Superior Court's denial of a motion for a new trial. Stevens' conviction was affirmed on appeal, with the exception of his conviction for unauthorized possession of ammunition. *Stevens v. People*, 52 V.I. 294 (V.I. 2009). Stevens later filed a post-sentencing motion for a new trial. In this motion, Stevens

alleged that exculpatory evidence was not disclosed by the prosecution, entitling him to a new trial. The Superior Court denied the motion, and Stevens filed this appeal. Stevens now argues that the Superior Court failed to apply the standard set out in *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) for non-disclosed evidence and failed to fully consider Stevens' arguments regarding the non-disclosed evidence. We hold that because the evidence identified by Stevens lacks materiality and was not suppressed, the Superior Court did not abuse its discretion by denying the motion for new trial.

## I. FACTS AND PROCEDURAL BACKGROUND

In the early evening of April 7, 2006, Ward shot a man named Darcy Thomas. Later that same evening, Ward was shot. The latter shooting occurred at approximately 11:30 p.m. while Ward stood outside a Cruz Bay bar, talking on his cell phone. Ward saw a blue Chevrolet van stop on the street in front of him. A sliding door on the driver's side opened, and Stevens appeared in the doorway, holding a shotgun. The two men spoke briefly, Ward turned, then began to walk away. Stevens shot Ward in the back then left the scene in the van.

After being shot, Ward went to the hospital. While still in the hospital, Ward gave a statement to police investigators in which he identified Stevens as the man who shot him. He also identified two other passengers in the van. Ward knew the driver of the van as "Raphel," later identified as Ralph Titre, and stated that the van belonged to Titre's mother. At trial, Ward testified that Titre and the front seat passenger, a man he knew as "Mickeal," later identified as Mekel Blash, were his cousins. Ward also stated that he was, prior to the shooting, friends with Stevens, Titre, and Blash. As a result of the evidence uncovered during the investigation, police arrested Stevens and charged him with nine offenses.[1]

---

[1] The charges against Stevens were as follows: Count I: Attempted First Degree Murder; Count II: Possessing an Unlicensed Firearm During the Commission of a Crime of Violence (Count I Attempted Murder); Count III: First Degree Assault with Intent to Commit Murder; Count IV: Possessing an Unlicensed Firearm During the Commission of a Crime of Violence (Count III First Degree Assault); Count V: First Degree Assault with Intent to Commit Mayhem; Count VI: Possessing an Unlicensed Firearm During the Commission of a Crime of Violence (Count V First Degree Assault); Count VII: Mayhem; Count VIII: Possessing an Unlicensed Firearm During the Commission of a Crime of Violence (Count VII Mayhem); Count IX: Unauthorized Possession of Ammunition.

At trial, Ward testified that Stevens shot him. Ward explained that because Stevens and Thomas were friends, he believed Stevens was retaliating for the earlier shooting of Thomas. Ward's testimony matched his prior statement to police: the blue van stopped in front of him, Stevens appeared with a shotgun in the doorway, they spoke, and Stevens shot Ward as he was walking away. Titre and Blash both testified at trial, as well. Blash admitted that he was in the van when the shooting took place and that a passenger in the van was the shooter, but denied that he knew the identity of his fellow passenger that fired the shots. Titre's testimony was riddled with contradictions: denying that he drove a van on the night of the shooting, then later admitting to driving his mother's van; denying that he was in Cruz Bay on the night of the shooting, then later admitting that he heard the gunshots while in Cruz Bay; and denying that he knew Stevens, then later admitting that Stevens was in the van he was driving on the night of the shooting. Both Titre and Blash gave statements to the police during the course of the investigation. These statements implicated Stevens, however, at trial Titre and Blash denied providing many of the responses attributed to them in the statements, and expressed, during their testimony, lapses in memory and doubts about the validity of the statements.

At the close of the prosecution, Stevens moved for a judgment of acquittal, which was granted on Counts V, VI, VII, and VIII, but denied for the remaining charges. Stevens based his defense on an alibi. Three witnesses testified that Stevens was at his friend Saihinly Tongue's house in Coral Bay during the day and night of the shooting. One witness, Muller, admitted that he left the house at least half an hour before the time of the shooting, while Tongue stated that he and Stevens stayed at home and fell asleep around 10:30 in the evening. The third witness, Clendinen, testified that he was in Cruz Bay within twenty feet of Ward when Ward was shot and that following the shooting, he drove to Tongue's house, where he woke Stevens to tell him about the shooting.

Stevens testified in his own defense, consistent with his alibi witnesses. Stevens stated that he was at Tongue's house the entire day, that he went to sleep around 11:00 p.m., and that he was awakened when Clendinen arrived at the house. Stevens denied knowing Blash or Titre before he was arrested. Ward testified in rebuttal that Stevens, Blash, and Titre were all friends.

The matter was submitted to the jury, which ultimately found Stevens guilty on all five remaining counts.[2] Stevens again moved for judgment of acquittal and a new trial because the verdict was contrary to the weight of the evidence. Both motions were denied, and Stevens appealed the denial. On appeal, this Court partially affirmed the Superior Court's decision, but reversed Stevens' conviction for Count IX, Unauthorized Possession of Ammunition.[3]

Stevens subsequently filed a post conviction motion for a new trial, which is the subject this appeal. In this motion, Stevens asserted that newly discovered evidence was previously suppressed by the prosecution in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), entitling him to a new trial. The evidence Stevens contended was newly discovered and suppressed includes police reports and an affidavit relating to a homicide investigation, all of which linked Ward to the June 19, 2007 killing of James Patrick Cockayne. Stevens claimed that had these investigative materials from the Cockayne murder been available to him, he would have been able to impeach Ward's credibility as a witness at his trial.

Additionally, Stevens cited the fact that the Bureau of Corrections released Ward prematurely while he was serving a fifteen month sentence following a conviction for the unauthorized possession of a firearm. This early release violated the terms of Ward's judgment of conviction and sentence. Stevens claimed that the early release was a *quid pro quo* for Ward's testimony at Stevens' trial. Had this alleged arrangement been disclosed prior to trial, Stevens argued, Ward's credibility would have been further questioned at trial.

Both the investigative materials from the Cockayne homicide and the alleged agreement between Ward and the government came to Stevens' attention following Ward's trial for the Cockayne murder.[4] Ward's trial began on October 6, 2008, more than a year after Stevens' trial. The jury

---

[2] The jury found Stevens guilty of Attempted First Degree Murder, Possessing an Unlicensed Firearm During the Commission of a Crime of Violence, First Degree Assault with Intent to Commit Murder, Possessing an Unlicensed Firearm During the Commission of a Crime of Violence, and Unauthorized Possession of Ammunition.

[3] This reversal followed a line of cases citing the lack of any law in the Virgin Islands creating a mechanism to authorize possession of ammunition. *See Stevens v. People*, 52 V.I. 294, 309 (V.I. 2009); *United States v. Daniel*, 518 F.3d 205, 49 V.I. 1169 (3d Cir. 2008).

[4] *People v. Ward*, 52 V.I. 71 (V.I. Super. Ct. 2009).

found Ward guilty of first degree murder, among other charges. Following the verdict, Ward moved for a judgment of acquittal and a new trial. In the process of resolving the post-trial motions, the trial court noted that the timing of Ward's premature release from prison and his subsequent testimony against Stevens raised the question of a *quid pro quo* arrangement. *People v. Ward*, 52 V.I. 71, 104-05 (V.I. Super. Ct. 2009). Following Ward's trial, Stevens renewed his investigation into Ward, and discovered the police reports and affidavit relating to the Cockayne investigation.

In resolving Stevens' motion, the Superior Court found that Stevens presented no evidence of an agreement for Ward to be released early from prison in exchange for his testimony against Stevens. Further, the Superior Court found that the prosecution did not suppress evidence of Ward's premature release, as it was a fact that Stevens "could have easily discovered." (J.A. 14.) Likewise, evidence that Ward was in protective custody prior to testifying, the court found, had not been suppressed because the prosecution had informed Stevens of the fact of Ward's custody status. The Superior Court also found that evidence of Ward's protective custody status was neither favorable nor material. Finally, the Superior Court stated that the police reports were inadmissible under Uniform Rule of Evidence § 834(d) and did not contradict evidence presented at trial. Based on these findings, the Superior Court held that Stevens was not deprived of a fair trial and that there was no *Brady* violation.

■ Stevens appeals the Superior Court's ruling, stating that the Superior Court erred, under *United States v. Bagley*, 473 U.S. 667, 678, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), by not considering whether there was a reasonable probability that, had the evidence been disclosed, there would have been a different outcome at trial and by not fully considering the impact of the evidence on the jury. Under *Bagley*, "suppression of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial." *Id.* at 678. For the reasons that follow, we find that Stevens was not deprived of a fair trial and affirm the judgment of the Superior Court.

## II. JURISDICTION AND STANDARD OF REVIEW

■ We have jurisdiction to review the Superior Court's order denying Stevens' motion for a new trial pursuant to title 4, section 32(a) of the

Virgin Islands Code, which provides that "[t]he Supreme Court shall have jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court." The Superior Court issued its final order denying Stevens motion for a new trial on December 17, 2009 and Stevens filed a notice of appeal on January 4, 2010. Therefore, Stevens' appeal was timely filed.

We review a denial of a motion for a new trial based on a *Brady* violation for an abuse of discretion. *Bowry v. People*, 52 V.I. 264, 268 (V.I. 2009). An abuse of discretion "arises only when the decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (internal quotation marks and citations omitted).

## III. DISCUSSION

■ In *Brady v. Maryland*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The purpose of *Brady* "is not to require the prosecution to disclose all possibly favorable evidence to the defense but to make certain that the defendant will not be denied access to evidence which would ensure him a fair trial." *Wilson v. Beard*, 589 F.3d 651, 659 (3d Cir. 2009). The ultimate inquiry "is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 437-38, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995).

■ In order to prevail on a *Brady* claim, "a defendant must show that the evidence was (1) suppressed, (2) favorable, and (3) material to the defense." *Bowry*, 52 V.I. at 274 (internal quotation marks omitted) (citing *Riley v. Taylor*, 277 F.3d 261, 301 (3d Cir. 2001)). Evidence is material if there is a "reasonable probability" that, if the evidence had been disclosed, the result of the proceeding would have been different. *Kyles*, 514 U.S. at 434; *see also Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972) (stating "[w]e do not, however, automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict."). Stevens argues that the

556

Superior Court "erred in not considering whether there was a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have different." (Appellant's Br. 2.) Stevens, then, is arguing that the Superior Court failed to consider the *Brady* materiality requirement. To evaluate materiality, a court must first "evaluate the tendency and force of the undisclosed evidence [to undermine confidence in the outcome of the trial] item by item," after which, the court should consider "its cumulative effect for materiality separately and at the end of the discussion." *Kyles*, 514 U.S. at 427 n.10.

### A. Evidence of Ward's Early Release Does Not Prove the Existence of an Undisclosed Agreement.

Stevens first argues that the prosecutors suppressed an agreement between Ward and the government that Ward would be released from prison early in exchange for his testimony against Stevens. The Superior Court found that Stevens provided no evidence of an alleged agreement between the prosecution and Ward for testimony in the Stevens case, and that even if the allegations were proven true, such evidence was unlikely to produce a different verdict.

██ ██ In support of his argument, Stevens relies heavily on an order issued by the trial court in Ward's prosecution for the Cockayne murder ("the *Ward* order"). In the *Ward* order, the trial court stated:

> Although the People insist that there was no *quid pro quo* for Defendant Jahlil Ward's testimony in the Denzil Stevens' [sic] prosecution, Defendant Jahlil Ward was inexplicably and prematurely released from the Bureau of Corrections on or about June 2, 2007. Defendant Jahlil Ward's illegal release conveniently occurred prior to the time he was scheduled to testify in the Denzil Stevens matter and while he was resisting giving such testimony. To "sweeten the pot," Defendant Jahlil Ward was placed in the People's Witness Protection Program and given a $439.60 ticket to travel "one-way" (arguably First Class) to New York, but only *after* he testified in the Denzil Stevens' [sic] prosecution. Strangely, this new brand of "witness protection" afforded the threatened witness the right to return to the very location from which he fled and was fearful for his life via a $630.00 "one-way" ticket (again, arguably First Class) to celebrate the St. John Carnival festivities in June 2008.

*Ward*, 52 V.I. at 104-05. While the *Ward* order indicates that the trial judge in Ward's murder prosecution suspected there was a *quid pro quo* for Ward to testify against Stevens and supports Stevens' own suspicions of such a deal, it falls well short of establishing the existence of any agreement between Ward and the prosecution, other than the agreement disclosed during trial. Specifically, the prosecution disclosed that Ward was in protective custody and that he would be given a one-way ticket to New York following the Stevens trial. There is insufficient evidence in this record to support the inference in the *Ward* order that Ward was released early from prison due to an undisclosed *quid pro quo* agreement. In the *Ward* order, the trial judge noted that an official from the Bureau of Corrections testified concerning Ward's early release. Ward's original sentence was for five years incarceration, with all but fifteen months suspended. The timesheet generated when Ward began his term of incarceration on August 17, 2006 erroneously stated that Ward's term was for only thirteen months. Ultimately, Ward was released on June 2, 2007, less than ten months after his term began.[5] While the trial judge in the Ward prosecution expressed doubts about this explanation in the *Ward* order, no other evidence was cited in the Ward prosecution to support any explanation other than the one provided by the Bureau of Corrections, that typographical errors were responsible for Ward's early release. Stevens' reasoning here approaches a tautology: the fact that Ward was improperly released from prison proves the existence of a *quid pro quo* agreement while the existence of a *quid pro quo* agreement proves that Ward was improperly released. Stevens fails to establish that the Superior Court's finding that Ward's early release was due to a clerical error is clearly erroneous. The only evidence, then, for the *Brady* evaluation is evidence that Ward was released early. Evidence of Ward's early release has no bearing on the fairness of Stevens' trial, and a Bureau of Corrections clerical error does not tend to contradict Stevens' conviction with any significant force.

## B. Ward's Protective Custody Was Not Suppressed.

Stevens' second argument is that the prosecution suppressed Ward's participation in a protective custody program and' misrepresented the

---

[5] The statute under which Ward was convicted, 14 V.I.C. § 2253(a), requires a minimum sentence of twelve months. While incarcerated, Ward was given credit for good behavior, resulting in a further reduction in his sentence below the twelve month requirement of the statute.

circumstances surrounding Ward's participation in protective custody. The Superior Court found that because the prosecution informed Stevens that Ward was in protective custody, there was no suppression and no *Brady* violation. Ward's status was disclosed at trial immediately prior to Ward's testimony. When the prosecution stated that Ward would be the next witness called, the marshal informed all present that Ward was "upstairs." (Tr. 32.) Following this statement, the prosecution, in a sidebar conference, disclosed the circumstances surrounding Ward's status:

> ATTORNEY HOLDER: Judge, I was just informed by the Marshal, as everyone else in the court that Jahlil Ward is upstairs, meaning he has been confined. I have requested that Jahlil Ward be placed in protective custody last week. As of yesterday, he still had not been there. Evidently, he was okay and then he was taken into protective custody.

> So I feel compelled to disclose the full circumstances of the benefits that he is getting because of his testimony now, that being the protective custody, and I believe an airplane flight, for his testimony, to New York. The one-way ticket.

> THE COURT: You're going to disclose the other terms of it?

> ATTORNEY HOLDER: That is it. That is it. There is no other terms [sic]. That we took him into protective custody as a result of certain allegations that he made, certain facts that he disclosed. As a result of certain allegations that he disclosed, we took him into protective custody yesterday. This was unbeknownst to me until when the Marshal just said it. Because as of 4:30 yesterday still nothing had been done.

> So I'm assuming he was taken into custody by my office and placed in lock up. It is my understanding that at the conclusion of his testimony that he is going to be taken off-island, flown to New York with a one-way ticket. That is the extent of our contact with him.

(Supplemental App. 5-7.) Stevens states that at trial "there appeared to be no advantage (and perhaps even risk) to question the basis for the 'protective custody.' " (Appellant's Br. 13.) On appeal, Stevens argues that the disclosure was a misrepresentation of Ward's status, based on the theory, discussed previously, that Ward and the prosecution made an "agreement of

freedom for testimony." (Appellant's Br. 14.) Again, Stevens provides insufficient evidence of this agreement, outside of the conclusions found in the *Ward* order. Additionally, Stevens makes much of the fact that Ward received, nearly a year after his testimony in the Stevens trial, a one-way return ticket from New York to St. Thomas. In the *Ward* order, the trial judge also found this strange. *Ward*, 52 V.I. at 105. Stevens does not, however, take note of the fact that upon Ward's arrival in St. Thomas on this government-provided flight, he was immediately arrested and charged with the Cockayne murder. *Id.* at 102.

■ With no evidence that Ward received any benefits for his testimony against Stevens other than protective custody and a flight to New York, Stevens has failed to identify any evidence that the prosecution suppressed. The prosecution disclosed, as soon as it was apparent, the fact of Ward's custody. The duty of a prosecutor is to "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused." *Kyles*, 514 U.S. at 427 (citing ABA Model Rule of Professional Conduct 3.8(d) (1984)). Because the prosecutor made timely disclosure of the fact of the protective custody — as soon as he learned that the witness was in protective custody — there is no non-disclosed evidence to evaluate, and no potential *Brady* violation arising from Ward's participation in protective custody.

## C. The Prosecution Had No Duty to Disclose the Evidence Generated During the Cockayne Homicide Investigation.

Stevens' third *Brady* claim involves documents generated during the investigation of the Cockayne homicide. The Superior Court found that these documents were not material, as "they would not have changed the outcome of the trial." (J.A. 16.) Stevens contends that these documents reveal that Ward was "a prime suspect in an infamous murder case" and that despite this, Ward was allowed to leave the island at the government's expense. This, Stevens claims, supports his theory of an illegal, undisclosed testimony-for-freedom agreement.

■ The evidence identified by Stevens was not disclosed prior to trial, but "we cannot consistently treat every nondisclosure as though it were error." *United States v. Agurs*, 427 U.S. 97, 111, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). An individual prosecutor "has a duty to learn of any favorable evidence known to others acting on the government's behalf *in the case*, including the police." *Kyles*, 514 U.S. at 437 (emphasis added).

560

No duty exists for a prosecutor to learn of favorable evidence collected by police *in all cases* under investigation, and Stevens does not establish any justification for requiring the prosecutor in the Stevens case to disclose material uncovered during the Cockayne investigation. While "our inquiry into the prosecution's knowledge need not stop at the prosecutor himself but should also extend to . . . the 'prosecution team' " which includes both investigative and prosecutorial personnel, Stevens has not established any connection between the team which prosecuted him and the team which prosecuted Ward. *United States v. Perdomo*, 929 F.2d 967, 970 (3d Cir. 1991).

■ Despite Stevens' failure to establish that the prosecution had a duty to disclose the investigative documents, the Superior Court determined that the documents lacked materiality. Stevens has likewise failed to demonstrate that this determination was erroneous. The Cockayne homicide took place on June 19, 2007, three months before the Stevens trial. Police interviewed Ward about the Cockayne homicide on the day it took place. Two months later, police obtained warrants and arrested two men for the Cockayne homicide: Kamal Thomas and Anselmo Boston. No warrant was issued for Ward's arrest until June of 2008, a year after Cockayne was killed and nine months after the Stevens trial. This timeline plainly contradicts Stevens' assertion that Ward was, at the time of the Stevens trial, a prime suspect in the Cockayne homicide.

Stevens next argues that the non-disclosed police reports would have allowed his investigator to locate Leayle Powell, a man identified by both Ward and Titre as a witness to Ward's shooting.[6] Stevens argues that Powell may have provided information important to the defense, demonstrated the superficial nature of the police investigation, and created doubt as to the People's case. Stevens does not allege that the prosecution attempted to hide Powell or otherwise prevent Powell's testimony from being heard. Instead, Stevens merely states that his investigator was unable to locate Powell, while the police were successful. At trial, Stevens' attorney was able to cross-examine Ward about Powell. Additionally, statements given by Ward and Titre shortly

---

[6] The only mention of Powell in the report that would have allegedly helped Stevens locate Powell is as follows: "On the same date [July 17, 2007] we also traveled to Estate Pastory where contact was made with Leayle Powell. He was questioned about this matter as to the death of James Cockayne." (J.A. 89.)

after the shooting identified Powell as a witness. The fact that police spoke with Powell prior to trial is not obviously exculpatory, and does not undermine confidence in the outcome of the trial. Indeed, Stevens presents nothing relating to the actual substance of what Powell witnessed, only that if Stevens were successful in locating Powell, he "possibly could have developed information important to the defense." (Appellant's Br. 16.) Therefore, the evidence relating to Leayle Powell does not tend to contradict Stevens' conviction with any significant force.

Stevens also alleges that the reports would have identified other witnesses with knowledge of Ward's criminal activity and dangerous personality, who could have been used to impeach Ward at trial. At trial, Stevens' attorney was able to cross-examine Ward about the Darcy Thomas shooting, which occurred on the same day that Ward was shot. Stevens' attorney was also able to argue at trial that Ward shot a man. Additionally, the prosecution provided Stevens, during discovery, with a National Crime Information Center report, detailing Ward's criminal history. Stevens had ample time and information available to evaluate Ward's character and attacked Ward's credibility at trial using the information provided. Because evidence of other witnesses with knowledge of Ward's criminal activities would be duplicative of evidence Stevens presented at trial regarding Ward's character and criminal activities, it does not tend to contradict Stevens' conviction with any significant force.

Stevens next points to a memorandum written by the prosecuting attorney to his supervisor, requesting protective custody for Ward. In the memorandum, the prosecuting attorney wrote that Ward reported receiving numerous phone calls from Stevens, who asked Ward not to testify, offered to return items stolen from Ward, and threatened Ward for being a "rat." Following these telephone calls, Ward was twice shot at by unnamed assailants. This memorandum, Stevens argues, shows that someone other than Stevens had a motive to harm Ward, because Stevens was incarcerated when the threats and shootings took place. As discussed previously, the prosecution informed Stevens that Ward was in custody, and Stevens' attorney, as a matter of strategy, chose not to inquire as to the details. Furthermore, evidence that Stevens, or someone acting on Stevens' behalf, threatened Ward in order to prevent his testimony is not obviously exculpatory, as reflected in Stevens' strategic decision at trial to avoid discussing the reasons Ward was in protective custody. Therefore,

562

the failure to disclose the memorandum does not tend to contradict Stevens' conviction with any significant force.

Finally, Stevens argues that the evidence which was not produced suggests that Ward is a sociopath, and had such evidence been disclosed, the defense would have requested that Ward undergo psychological evaluations, which may have shown Ward to be a pathological liar. (Appellant's Br. 18.) As support for this argument, Stevens only provides a checklist of sociopathic traits printed from an internet website. Such reasoning rests upon multiple unfounded assumptions and diagnoses. Stevens assumes that the Superior Court would have ordered Ward, a witness, to undergo a psychological evaluation, but does not refer to any authority allowing the court to do so. Stevens next assumes that had the court required the examination, the examining psychologist would have agreed with his diagnosis that Ward is a sociopath and pathological liar, which Stevens bases on little more than Ward's glib, confident performance at trial. Next, Stevens assumes that had Ward been diagnosed, evidence of that diagnosis would have been admissible at trial. Again, Stevens provides no authority for this assumption. Stevens' final assumption is that had such evidence been admitted, it would have swayed the jury in Stevens' favor. As presented by Stevens, such speculation could not be admitted at trial and is not at all material to Stevens' conviction, nor does it tend to contradict Stevens' conviction with any significant force.

### D. The Cumulative Effect of the Undisclosed Evidence Does Not Undermine Confidence in the Verdict.

To summarize, the fact of Ward's protective custody was disclosed as soon as it was known to the prosecution. The only undisclosed evidence then is Ward's early release from prison and the documents generated during the Cockayne homicide investigation, and Stevens has not established that the prosecution had an obligation to disclose this evidence. Stevens has presented insufficient evidence to establish the existence of an improper, undisclosed *quid pro quo* agreement between Ward and the prosecution. And, despite Stevens' multiple assertions, the evidence does not establish that Ward was a "prime suspect" in the Cockayne homicide at the time of the Stevens trial. Taken cumulatively, the evidence relating to Ward's premature release from prison and the documents generated during the Cockayne investigation cannot

"reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. Therefore, Stevens has failed to satisfy the materiality requirement of a *Brady* violation and the Superior Court did not abuse its discretion by denying Stevens' motion for a new trial.

## IV. CONCLUSION

Stevens has failed to establish that the Superior Court abused its discretion by finding that no undisclosed agreement existed between Ward and the prosecution under which Ward was released from jail early in exchange for his testimony against Stevens. The prosecution did not misrepresent the circumstances surrounding Ward's participation in protective custody, nor did the prosecution suppress Ward's participation. None of the documents generated during the Cockayne investigation contradict Stevens' conviction with significant force, and taken cumulatively they do not undermine confidence in the verdict. These documents fail to meet the materiality requirement of *Brady*; therefore the non-disclosure of these documents did not deprive Stevens of his right to a fair trial. Because the non-disclosed evidence lacked materiality, the Superior Court did not abuse its discretion by denying Stevens' motion for a new trial. Therefore, we affirm the Superior Court's order denying Stevens' motion for a new trial.