**PEOPLE OF THE VIRGIN ISLANDS, Plaintiff**
**v.**
**JAHLIL J. WARD (D.O.B. 10/22/87), Defendant**

Crim. No. F264/2008
Superior Court of the Virgin Islands
Division of St. Thomas and St. John
August 5, 2009

73

74

75

RENEE CARTY-GUMBS, ESQ., BRENDA C. SCALES, ESQ., Assistant Attorney General, Virgin Islands Department of Justice, St. Thomas, USVI, *Attorneys for the Plaintiff.*

MICHAEL C. QUINN, ESQ., ASHLEE GRAY, ESQ., Dudley Topper & Feuerzeig, LLP, St. Thomas, USVI, *Attorneys for the Defendant.*

HOLLAR, *Judge*

## MEMORANDUM OPINION

(August 5, 2009)

Following a verdict of guilty on Counts I, III and IV of Defendant Jahlil Ward's Second Amended Information, a flurry of post trial motions were filed on his behalf requesting *inter alia* judgment of acquittal and a new trial. Counsel for the People has opposed the requested relief.

## I. BACKGROUND AND PROCEDURAL POSTURE

This matter, consolidated with *People of the Virgin Islands v. Anselmo Boston*, ST-07-CR-307 and *People of the Virgin Islands v. Kamal Thomas*, ST-07-CR-298, came on for jury trial on Monday, October 6, 2008. On Tuesday, October 7, 2008 the People rested. On Wednesday, October 8, 2009, the Court, jury and respective parties sojourned to the island of St. John to view the crime scenes and the other places mentioned by witnesses during the People's case in chief. Upon returning to St. Thomas, the trial reconvened, after which, counsel for Defendant Jahlil Ward made an oral motion for judgment of acquittal on all counts pursuant to FED. R. CRIM. P. 29 and argued in support of the motion on the record. The People vehemently opposed the motion.

The Court denied Defendant Jahlil Ward's motion with respect to Count I, first degree murder, Count II, second degree murder, Count III, third degree assault, and Count VI, using a dangerous weapon during a third degree assault. The Defendants then presented their cases, after which, counsel for all the Defendants rested. The People had no rebuttal.

On Thursday, October 9, 2008, the parties made their closing arguments and the jury was given final instructions. Thereafter, the Court recessed for the evening to return the next morning. On Friday, October 10, 2008, the jury retired to deliberate. During deliberations, the jury made a request to review certain pieces of evidence and trial testimony. Specifically, the jury transmitted two (2) notes to the Court's attention. Note #1 stated:

> **"May we have Mr. Rawlins, Ms. Oquendo, Mr. O'Connell and Mr. Ferguson's testimony."**

Note #1 was discussed with counsel for the parties. During that discussion, the Court received a second note from the jury. Note #2 stated:

> **"May we have Officer Stout written testimony that he received from Mr. Thomas and Agent Tyson's written report."**

Further discussion was made with counsel and the jury was brought into the courtroom where it was advised that the testimony of all four (4) witnesses would not be read back. Additionally, the Court re-instructed and encouraged the jury to rely on its own recollection. If there was however, a specific portion of a witness's testimony that was critical in their deliberations, they

were informed to identify that portion they would like to have read back. With respect to Note #2, the Court informed the jury that the reports of both Officer Stout and Agent Tyson were not admitted into evidence and therefore cannot be reviewed. Thereafter, the jury was ordered to resume deliberations.

The Court subsequently received a third note from the jury. This note was also shared with the parties. Note #3 stated:

> **"After reviewing our notes and recollections, we drop our request (referring to Note #1) and apologize for any inconvenience."**

Shortly thereafter, the jury informed the Court that it had reached a verdict. The verdict was read in open court. Defendant Jahlil Ward was found "Guilty" on Counts I, III, and IV of the Second Amended Information.

Following the reading of the verdicts, the Court asked defense counsel whether they wanted the jury polled, to which all responded in the affirmative. Each juror was polled by the Clerk and confirmed that the verdict represented his or her decision. The jurors were then thanked and discharged. Upon defense counsel's request that the Court reconsider its ruling on his Rule 29 motion, the Court ordered counsel for Defendant Jahlil Ward to submit his request for reconsideration along with memoranda on or before October 24, 2008. The Court informed the People that its response must be submitted on November 7, 2008. Sentencing was scheduled for Friday, November 14, 2008. The Court ordered that a pre-sentence report be prepared and that the victims be advised of their rights to include a victim's impact statement in the pre-sentence report and testify, if they choose to do so, at sentencing. Defendant Jahlil Ward was thereafter remanded to the Bureau of Corrections pending sentencing.

At sentencing on Friday, November 14, 2008, the Court admonished counsel for filing untimely motions, requiring further review and research. The Court stated it would hear arguments on the parties' post trial motions, but it was not optimistic that sentencing could proceed without resolution on all outstanding motions. Counsel for Defendant Jahlil Ward thereafter presented two (2) arguments to the Court. Preliminarily, counsel for Defendant argued that a judgment of acquittal must be entered on Count I because the People presented insufficient evidence to establish premeditation for first degree murder. Defense

counsel stated that the only evidence upon which the People were relying to establish premeditation was the number of wounds sustained by James Cockayne rather than evidence of "motive." As such, counsel for Defendant contended that under applicable law, the premeditation required for a conviction of first degree murder cannot be established solely by the "sheer number of wounds" sustained by a victim.

Secondly, defense counsel contended that a new trial must be ordered because the jury's verdict was against the weight of the evidence and the Court made erroneous trial rulings that, within a reasonable probability, had a substantial influence on the jury verdict. Specifically, (i) the Court made an erroneous ruling regarding defense counsel's impeachment of Jamal Jackson, a witness for the People, thereby authorizing the admission of irrelevant evidence; and (ii) the Court made an erroneous when it refused to honor the jury's request to read back the testimony of Rawlins, Frazier, Clendenin and Ferguson.

Further, in his Motion for Judgment of Acquittal and a New Trial dated October 24, 2008, counsel for Defendant stated that a new trial must be ordered due to the Court's denial of his oral motion for continuance prior to trial. Specifically, Defendant moved for a continuance the day before trial in order to investigate the basis why certain alibi witnesses suddenly refused to testify. This motion was denied by the Court. Defendant contends that the Court's denial was an abuse of discretion. The People objected to Defendant's motions. The Court considered all arguments and invited the parties to file supplements to their respective briefs. Sentencing was then postponed until a ruling is made on the pending post-trial motions.

On January 12, 2009, Defendant submitted an additional Motion for New Trial on the grounds of newly discovered evidence. Specifically, Defendant's Motion for New Trial contains a declaration of Mr. Donald Lee. According to Mr. Lee, "last *February or March*," (2008), he "ran into" Defendant Kamal Thomas and after a short conversation Defendant Thomas told him that he (Defendant Kamal Thomas) was wearing an electronic ankle monitor "because he killed a white guy on St. John." Counsel for Defendant interviewed Mr. Lee on January 9, 2009 and reduced the exchange to writing. Additionally, counsel for Defendant maintains that: (i) he did not have knowledge of Mr. Lee's existence prior to January 9, 2009; (ii) "no amount of diligence would have disclosed Mr. Lee's existence" prior to trial; and (iii) Defendant Kamal Thomas'

confession is material and is likely to produce an acquittal if presented at a new trial.

Approximately four (4) months after trial, in a correspondence directed to the attention of Defendant Jahlil Ward's counsel, counsel for the People disclosed that she inadvertently failed to turn over the statement of Daryl G. Martens that implicated Defendant Kamal Thomas as the murderer of James Patrick Cockayne. On April 15, 2009, Defendant Jahlil Ward filed a Motion for New Trial Based upon the People's Violation of *Brady v. Maryland*. On May 4, 2009, the People submitted its Opposition to Defendant Jahlil Ward's Motion for New Trial, after which, Defendant Jahlil Ward filed a Reply. In its May 27, 2009 Order, this Court propounded interrogatories requiring the prosecution to respond to its inquiries. On June 18, 2009, the People filed their Response to the Court's Order dated May 27, 2009. Defendant Jahlil Ward submitted an Informational Motion Concerning the Court's May 27, 2009 Order on June 22, 2009. On Monday, July 27, 2009, the Court heard argument on all pending motions.

## II. STANDARD OF REVIEW FOR JUDGMENT OF ACQUITTAL

In reviewing a FED. R. CRIM. P. 29[1] post-verdict motion for judgment of acquittal, a court must "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence," *United States v. Wolfe*, 245 F.3d 257, 262 (3d Cir. 2001). The court is required to "draw all reasonable inferences in favor of the jury's verdict." *United States v. Aderskow*, 88 F.3d 245, 251 (3d Cir.

---

[1] **Rule 29. Motion for a Judgment of Acquittal**
 **(c) AFTER JURY VERDICT OR DISCHARGE.**
 (2) *Ruling on the Motion.* If the jury has returned a guilty verdict, the court may set aside the verdict and enter a judgment of acquittal. If the jury has failed to return a verdict, the court may enter a judgment of acquittal.
FED. R. CRIM. P. 29 is made applicable to the Superior Court by SUPER. CT. R. 7. SUPER. CT. R. 7 states:
 **Rule 7. Practice in the Superior Court**
 The practice and procedure in the Superior Court shall be governed by the Rules of the Superior Court and, to the extent not inconsistent therewith, by the Rules of the District Court, the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure and the Federal Rules of Evidence.

1996), Thus, a finding of insufficiency should "be confined to cases where the prosecution's failure is clear." *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984), (*See also United States v. Smith*, 294 F.3d 473, 478 (3d Cir. 2002)).

## III. STANDARD OF REVIEW FOR A NEW TRIAL

A motion for new trial is governed by SUPER. CT. R. 135[2] and FED. R. CRIM. P. 33.[3] The decision whether to grant a motion for a new trial on the ground that the verdict is contrary to the weight of the evidence is committed to the sound discretion of the trial court, which may set aside the verdict and order a new trial if it ascertains that the verdict constitutes a miscarriage of justice. The Court may grant a new trial to a defendant if required in the interest of justice and must grant a new trial if there is a reasonable probability that error affecting the prior proceedings could have had a substantial influence on the jury's decision. Therefore, when considering a motion for new trial, the court, having cautiously weighed the evidence and credibility of witnesses, may exercise its discretion to order a new trial, if it finds that the evidence preponderates heavily

---

[2] SUPER. CT. R. 135 provides:

### Rule 135. New Trial

The court may grant a new trial to a defendant if required in the interest of justice. The court may vacate the judgment if entered, tax additional testimony and direct the entry of a new judgment. A motion for a new trial based on the ground of newly discovered evidence may be made only before, or within two years after, final judgment. A motion for a new trial based on other grounds shall he made within 10 days after finding of guilty, or within such further time as the court may fix during the 10-day period. In no event shall this rule he construed to limit the right of a defendant to apply to the court for a new trial on the ground of fraud or lack of jurisdiction.

[3] FED. R. CRIM. P. 33:

(a) DEFENDANT'S MOTION. Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment.

(b) TIME TO FILE.

(1) *Newly Discovered Evidence*. Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for new trial until the appellate court remands the case.

(2) *Other Grounds*. Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 7 days after the verdict or finding of guilty.

against the verdict; however, such an exercise of discretion is to be used only in exceptional circumstances, *United States v. Bevans*, 728 F. Supp. 340, 343, 1990 U.S. Dist. LEXIS 70 (E.D. Pa. 1990); *U.S. v. Petersen*, 2009 U.S. Dist. LEXIS 7696 (D.V.I. 2009); *U.S. v. Dorsett*, 2009 U.S. Dist. LEXIS 2861 (D.V.I. 2009); *People v. Brewley*, 49 V.I. 137, 141 (Super. Ct. 2007); *United States v. Martorano*, 596 F. Supp. 621, 624 (E.D. Pa. 1984), *aff'd*, 767 F.2d 63 (3d Cir.) *cert. denied*, 474 U.S. 949, 106 S. Ct. 348, 88 L. Ed. 2d 296 (1985); *United States v. Phifer*, 400 F. Supp. 719, 723 (E.D. Pa. 1975), *aff'd*, 532 F.2d 748 (3d Cir. 1976); *Government of Virgin Islands v. Bedford*, 671 F.2d 758, 762 (3d Cir. 1982); *United States v. Mastro*, 570 F. Supp. 1388 (E.D. Pa. 1983); *Government of the Virgin Islands v. Leycock*, 19 V.I. 59, 1982 U.S. Dist. LEXIS 9248 (D.C.V.I. 1982). (*See also Government of the V.I. v. Smalls*, 32 V.I. 157, 1995 V.I. LEXIS 28 (Terr. Ct. St. T. and St. J. 1995)); *Government of the Virgin Islands v. Commissiong*, 706 F. Supp. 1172, 1989 U.S. Dist. LEXIS 1475 (D.C.V.I. 1989); *Government of the V.I. v. Grant*, 19 V.I. 20, 1984 U.S. Dist. LEXIS 16265 (D.C.V.I. 1984).

## IV. ANALYSIS

The issues to be resolved by this Court are: (1) whether there was insufficient evidence adduced at trial to establish premeditation for first degree murder to grant Defendant's Motion for Judgment of Acquittal on Count 1; (2) whether Defendant's Motion For A New Trial should be granted on the basis of insufficiency of evidence and errors in Court rulings; (3) whether the People committed a *Brady* violation when they failed to turn over a statement to Defendant Jahlil Ward by Daryl G. Martens that implicated Defendant Kamal Thomas as the murderer of James Patrick Cockayne; and (4) If the People did commit a *Brady* violation that was not discovered until after trial, is there any sanction available other than a new trial, when the violation is material.

**A. There Was Sufficient Evidence Adduced At Trial To Establish "Premeditation" For First Degree Murder And As Such Defendant's Motion For Judgment Of Acquittal On Count I Should Be Denied.**

Title 14 V.I.C. §§ 921 and 922 define the crime of murder as follows:

§ 921. Murder defined

Murder is the unlawful killing of a human being with malice aforethought.

§ 922. First and second degree murder defined

(a) All murder which—

(1) is perpetrated by means of poison, lying in wait, torture or by any other kind of willful, deliberate and **premeditated** killing; or

(2) is committed in the perpetration or attempt to perpetrate arson, burglary, kidnapping, rape, robbery or mayhem- is murder in the first degree.

(b) All other kinds of murder are murder in the second degree.

Consistent with statutory requirement, elements of willfulness, deliberateness and premeditation must be established to the satisfaction of a trier of facts beyond a reasonable doubt in order to sustain a conviction of murder in the first degree. 14 V.I.C. § 922(a)(1).

█ To premeditate a killing is to conceive the design or plan to kill. *Government of the Virgin Islands v. Martinez*, 780 F.2d 302, 305 (3d Cir. 1985). A deliberate killing is one which has been planned and reflected upon by the accused and is committed in a cool state of the blood, not in sudden passion engendered by just cause of provocation. *Id.* It is not required, however, that the accused shall have brooded over his plan to kill or entertained it for any considerable period of time. *Id.* Although the mental processes involved must take place prior to the killing, a brief moment of thought may be sufficient to form a fixed, deliberate design to kill. *Id.* The element of premeditation may he inferred from the circumstances surrounding the homicide. *Government of Virgin islands v. Roldan*, 16 V.I. 683, 612 F.2d 775, 781 (3d Cir. 1979). (*See also Government of the Virgin Islands v Lanclos*, 9 V.I. 579, 477 F.2d 603 (3d Cir. 1973); *Government of the Virgin Islands v. Lake*, 5 V.I. 594, 362 F.2d 770 (3d Cir. 1966)).

█ In *Roldan supra*, the defendant challenged his conviction claiming that the evidence was insufficient to establish premeditation and deliberation. *Roldan*, 612 F.2d at 781. Moreover, Roldan argued that the record was barren of any affirmative proof of premeditation on his part and therefore evidence of premeditation and deliberation was insufficient to sustain his conviction for first degree murder under V.I. CODE ANN. tit.

14 § 922(a)(1). *Roldan*, 612 F.2d at 781. Disagreeing with the defendant's contentions, the court in *Roldan* upheld his conviction. In its decision, the court reasoned that if premeditation is found it must ordinarily be inferred from the objective facts, as a defendant's mental processes are wholly subjective and seldom possible to prove directly. *Roldan*, 612 F.2d at 781.

Moreover, various factors can establish proof of premeditation. *Roldan*, 612 F.2d at 782. These factors include but are not limited to: (i) manner of killing; (ii) probable manner in which injuries were inflicted; (iii) use of a deadly weapon; (iv) use of a deadly weapon on an unarmed victim and (v) conduct of the defendant after the incident. *Id. (See also Government of the Virgin Islands v. Lake*, 5 V.I. 594, 362 F.2d 770 (3d Cir. 1966)).

In the case *sub judice*, the deceased sustained numerous deep stab and slash wounds about his body including the fatal wound which severed his femoral artery. The aforesaid injuries were sustained after an *escalating* quarrel and subsequent "struggle" with the Defendant. Significantly, the injuries were inflicted by a dangerous/deadly weapon, to wit: a knife. No evidence appears in the record that the deceased had been armed. Not only was there evidence that Defendant attempted to conceal his actions by fleeing the scene, but there was also evidence that Defendant subsequently confided in and/or "bragged" to third parties about his actions. In fact, Defendant, on two-occasions, stated that he had "killed a white boy."

The Defendant asserts, however, that the jury's verdict was not a product of legitimate inferences. Instead, Defendant contends that the jury "must have engaged in false surmise and rank speculation" prior to rendering its verdict. Not only does the Court find Defendant's arguments unavailing, but the record is also replete with evidence to raise a legitimate inference of premeditation. Indeed, courts have held that a jury may infer premeditation merely from the use by the defendant, as was the case here, of a deadly weapon and that such an inference is permissible particularly in cases where a deadly weapon is used on an unarmed victim and thereafter disposed. *State v. Jackson*, 251 Iowa 537, 101 N.W.2d 731 (1960); *State v. Hamilton*, 216 Kan. 559, 534 P.2d 226 (1975).

Defendant's selection of a deadly weapon, its use to perpetrate wounds to vital parts of the deceased, especially the delivery of multiple thrusts, all point to the existence, at the time of the killing, of the mental state described as premeditation. As such, the Court finds that there was

sufficient evidence adduced at trial from which a rational trier of fact could establish "premeditation" for first degree murder. Therefore, Defendant's Motion for Judgment of Acquittal on Count I for insufficient evidence is denied.

## B. Defendant's Motion For A New Trial Should Be Denied On The Basis Of Insufficiency Of Evidence And Errors In Court Rulings.

Upon considering Defendant's Motion for A New Trial, the following issues must be addressed: (i) whether the jury's verdict is against the weight of the evidence; (ii) whether the Court erred in ruling that defense counsel "opened the door" for introduction of evidence by the People that Defendant Jahlil Ward was involved in a shooting; (iii) whether the Court erred when it denied the jury's request to read back the testimony of four (4) witnesses and instructed jurors to rely on their own recollections; and (iv) whether the Court's denial of Defendant's oral motion for continuance warrants a new trial;

### 1. The Weight of the Evidence

In ruling on a defendant's motion for new trial, a court must weigh the evidence rather than examine its sufficiency and in doing so, it may weigh the credibility of witnesses. *United States v. Messerlian*, 633 F. Supp. 1493, 1513 (D.N.J. 1986); *United States v. Clemons*, 658 F. Supp. 1116, 1119 (W.D. Pa. 1987). *See generally United States v. Levy*, 694 F. Supp. 1136, 1144-45 (D.N.J. 1988).

In his Motion for A New Trial, Defendant Ward contends that the jury's verdict is against the weight of the evidence. Testimony of the prosecution's main witnesses could either be incredible, pure fabrication or "flatly inconsistent" with the testimony of other prosecution witnesses. But even if the testimony of a witness was inconsistent with that of another witness, the balance of the evidence, including all the facts and circumstances surrounding the killing, would still be sufficient to uphold Defendant's conviction. Moreover, the jury was given final instructions that were deemed satisfactory by defense counsel and returned a guilty verdict on all four (4) counts of the Second Amended Information. If the jury believed, as Defendant alleges, that the testimony of almost every witness for the People was "unworthy of belief" it would not have returned the verdict that it did. Accordingly, the Defendant's Motion for

a New Trial because the verdict was against the weight of the evidence is denied.

## 2. Alleged Errors at Trial

■ It is well settled that under the U.S. Constitution, a criminal defendant is not entitled to a perfect trial. *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S. Ct. 1431, 1436, 89 L. Ed. 2d 674 (1986). Rather, a defendant is entitled to a "fair trial." *Id. (See also United States v. Hasting*, 461 U.S. 499, 508-509, 103 S. Ct. 1974, 1980, 76 L. Ed. 2d 96 (1983); *Bruton v. United States*, 391 U.S. 123, 135, 88 S. Ct. 1620, 1627, 20 L. Ed. 2d 476 (1968)). In passing on a defendant's motion for a new trial under FED. R. CRIM. P. 33, a court must grant the motion on the ground of trial error only "if there is a reasonable probability that trial error could have had a substantial influence on the jury's decision." *United States v. Mastro*, 570 F. Supp. 1388, 1390 (E.D. Pa. 1983) (citing *Government of the Virgin Islands v. Bedford*, 671 F.2d 758, 762 (3d Cir. 1982)).

### a. Defense counsel's impeachment of Jamal Jackson and the "Open Door" Doctrine

The Defendant contends that the Court made an erroneous trial ruling when it authorized the admission of testimony concerning a shooting by Defendant Ward after defense counsel's impeachment of Jamal Jackson, a witness for the People. Defendant claims the error, within a reasonable probability, had a substantial influence on the Jury's verdict Specifically, Defendant argues that the Court erred when it allowed evidence of motive *after* defense counsel impeached Jamal Jackson by questioning him about the use of his gun in his friend Denzil Steven's attempt on Defendant Ward's life.

Methods of "impeachment" are discussed fully under FED. R. EVID. 607. According to Rule 607, the purpose of impeachment is to impugn a witness's credibility by attacking his ability to perceive the event, recall accurately that which he perceived, or communicate his story accurately, or his desire to testify truthfully. FED. R. EVID. 607. There exist five (5) permitted methods of impeachment: (1) untruthful character; (2) bias; (3) prior inconsistent statements: (4) defects of capacity; and (5) contradiction. However, Rule 607 is governed by FED. R. EVID. 403 which is designed to preclude the admission of even *relevant evidence* if

its probative value is substantially outweighed by the danger of *unfair* prejudice.

■ Here, defense counsel states that Jamal Jackson's testimony was "unworthy of belief" because of apparent animus between him and Defendant Ward since Jackson supplied a gun to Denzil Stevens who subsequently shot and injured the Defendant. Defense counsel maintains that Jamal Jackson was biased against Defendant and therefore his purpose for questioning Jamal Jackson about Denzil Steven's attempted murder of Defendant "was solely to impeach Jackson's credibility." "Bias" describes "the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against the party" and the U.S. Supreme Court has made it clear that it is a proper impeachment technique. *United States v. Abel*, 469 U.S. 45, 52, 105 S. Ct. 465, 469, 83 L. Ed. 2d 450 (1984).

Following defense counsel's cross examination of Jamal Jackson, suggesting his possible bias against Defendant Ward, counsel for the People on re-direct asked Mr. Jackson whether he knew about Defendant Ward shooting an individual named Darcy Thomas in the hand.[4] Counsel for the Defendant objected to the prosecutor's questioning. However, the Court allowed the testimony applying the "open door" doctrine.

In moving for a new trial, defense counsel contends that the Court erroneously applied the "open door" doctrine in allowing counsel for the People to question Jamal Jackson about the reasons why Mr. Steven shot Defendant Ward and allowing counsel for the People to mention that Defendant Ward had shot an individual named Darcy Thomas in the hand at a time prior to him sustaining gunshot injuries. Defense counsel not only rejects the applicability of the "open door" doctrine and but also he maintains that the People's questions regarding Defendant Ward's involvement in a shooting was outside the scope of rehabilitation, irrelevant and prejudicial, Moreover, defense counsel further asserts that even if the Court's decision was justified, the prosecution did not connect the two events and thus reference to the shooting of Darcy Thomas by Defendant Jahlil Ward was done only to prove Defendant's had character.

■ Although defense counsel contends that his sole purpose for cross-examining Jamal Jackson concerning the gun that ultimately shot

---

[4] This shooting by Defendant Jahlil Ward of Darcy Thomas took place less than twenty-four (24) hours before Denzil Stevens shot Ward.

Defendant Ward was to merely establish his bias against Defendant,[5] such was obviously not the only inference that could be derived from the inquiry. In fact, it is unclear whether the impeachment inquiry was merely a pretext to garner sympathy for Defendant Ward while simultaneously establishing that Defendant Ward was a victim of a violent crime and not a perpetrator of violence or an aggressor. The impeachment testimony came on the heels of prior testimony that Defendant Ward tried to break up a fight between Defendant Anselmo Boston and the decedent, James P. Cockayne. By implication, counsel was attempting to establish Defendant Ward's trait for being peaceful and law abiding. Having done so, defense counsel placed Defendant Ward's character in issue and "opened the door" for the prosecution to rebut the same, FED. R. EVID. 404(a); *U.S. v. Delta-X Corp.*, 1993 U.S. Dist. LEXIS 247 (ED. Pa 1993), *affirmed in part and reversed in part*; *Plaskett v. Government of the Virgin Islands*, 147 F. Supp. 2d 367 (D.V.1. 2001).

In *Roldan supra*, the court held "that a statement which was made in response to question of defense counsel directed toward establishing that defendant had little contact with anyone and would therefore be unlikely to have reason to murder anyone and which was to [the] effect that defendant never bothered anybody was not a gratuitous unsolicited remark, but was the type of answer called for by the defense counsel and was such as to put defendant's character in issue so as to authorize the People to put in evidence defendant's bad character through impeachment of witness' good character assessment by asking witness about her familiarity with defendant's prior murder conviction."

The instant matter is similar to the issue in *Roldan*. Although counsel for Defendant Ward strenuously objected to any attempt of using 404(b) testimony against his client, (*see* Transcript dated October 1, 2008, Pretrial Conference, pp. 6-9), defense counsel took a calculated risk once he made inquiry concerning his client being shot. At that juncture, defense counsel "opened the door" for the prosecution to put in evidence of Defendant Ward's bad character. Additionally, even if the People should have connected the Darcy Thomas and Denzil Steven incidents, (which it did not), the Court's decision to allow the questioning and subsequent

---

[5] Although Jamal Jackson supplied Denzil Stevens with the gun that was ultimately used to shoot Defendant Jahlil Ward, it was never established that Jamal Jackson knew, at the time he gave the gun to Denzil Stevens, Denzil Stevens' intended use for the firearm.

testimony was justified. This is because the prosecution obviously felt that it had established "retaliation" which can be inferred from its line of questioning. The People's questioning regarding the Darcy Thomas incident was relevant and supported the reasonable inference that Denzil Steven attempted to kill Defendant as a retaliatory act for the shooting of Darcy Thomas by Defendant Jahlil Ward.

Because Jamal Jackson displayed unusual candor on the witness stand through his outright admission under oath to owning and supplying the gun used by Denzil Steven in the attempt on Defendant's life, any implication that Jackson's testimony was concocted and/or a fabrication is unlikely. In fact, Jackson's admission was made without him being afforded immunity and despite jeopardizing his Fifth Amendment guarantees. These factors arguably evidence Mr. Jackson's forthrightness and/or credibility.

Furthermore, at no time was it established that Defendant Ward knew that Jamal Jackson had provided the gun that shot him. Absent this fact, the question of whether it was logical for Defendant to confide in Jackson is a *non sequitur* since it is *Defendant's state of mind at the time he confessed his transgression, to wit: that he killed James P. Cockayne* that is relevant. Additionally, even if Defendant Ward knew that Jackson provided the gun to Denzil Steven, his admission to Jackson that he killed "a white boy" could he construed as a threat that translates into, "I killed a white boy and I can kill you too." Given any of the scenarios, the Court did not err in ruling that upon defense counsel's attempt to impeach Jamal Jackson, defense counsel "opened the door" to the admission of evidence concerning Defendant's bad acts.

### b. Court's denial of jury's request

██ Defendant's second assignment error warranting a new trial is the Court's denial of the jury's request to read back the entire testimony of four (4) witnesses and its instruction to jurors to rely on their own recollections. Defendant correctly states that "[a] trial court has broad discretion in deciding whether to accede to a jury's request for a *reading of testimony.*" *United States Bertoli*, 40 F.3d 1384, 1400 (3d Cir. 1994) *quoting United States v. Zarintash*, 736 F.2d 66, 69-70 (3d Cir. 1984) (emphasis added); *United States v. Chrzanowski*, 502 F.2d 573, 577 (3d Cir. 1974) (same); *United States v. Rabb*, 453 F.2d 1012, 1013 (3d Cir.

1971) (same); *United States v. Chicarelli*, 445 F.2d 1111, 1114-15 (3d Cir. 1971) (same).

 However, two (2) considerations limiting a courts' discretion are as follows: (1) whether such requests may slow the trial where the requested testimony is lengthy; (2) whether the jury's reading of only a portion of testimony may give undue weight to that portion. *Bertoli*, 40 F.3d at 1400. Unless a trial court's refusal to read back testimony is supported by one of these two concerns, "a trial judge abuses his discretion" by denying the request. *Zarintash*, 736 F.2d at 70 (citing *Rabb*, 453 F.2d at 1013-14). It is also well-settled that during jury deliberations, the jury's recollection of the evidence is what controls.

 Here, the jury requested the reading back of four (4) witnesses' testimony and the Court denied the request because each witness's testimony was substantial in length and would have significantly slowed the trial.[6] Also, the Court denied the jury's request in order to avoid giving undue weight to the read-back portion. Indeed, an inattentive juror may be persuaded unduly by an attentive juror's version of the read-back testimony and a juror's mishearing of read-back testimony cannot be corrected by a second look. *Bertoli*, 40 F.3d at 1400. Moreover, the Court did indicate that it would entertain a request if more specific. The jury subsequently withdrew its request and informed the Court that upon reviewing its notes and recollection, it no longer needed to have the testimony read-back. For these reasons, the Court did not err in denying the jury's request to read back the testimony of witnesses requested.

### 3. Court's Denial of Defendant's Motion to Continue

 Defendant Jahlil Ward argues that the Court abused its discretion in denying his motion to continue made one (1) day prior to trial. Specifically, counsel for Defendant requested the continuance on the grounds that certain purported alibi witnesses suddenly refused to testify at trial. Upon inquiry, the Court determined that the alleged alibi witnesses' refusal to testify appeared to be the result of a change of heart and/or mind rather than intimidation. As such, the Court did not abuse its

---

[6] Unfortunately, counsel for Defendant Jahlil Ward impermissibly invited the jury to make such a request during his closing argument. The Court should have stopped counsel and corrected his suggestion but decided not to do so because it would be instructing jurors otherwise.

90

discretion in denying Defendant Jahlil Ward's oral motion to continue one (1) day prior to trial. Moreover, counsel for Defendant Jahlil Ward neither requested the Court to issue any warrants nor did he establish which, if any, of the alleged alibi witnesses were served and yet failed to appear.

### 4. Defendant's Motion for A New Trial Dated January 12, 2009

On January 12, 2009, Defendant Jahlil Ward filed a Motion for A New Trial on the grounds of newly discovered evidence. Specifically, Defendant Jahlil Ward's motion was premised on newly discovered evidence from a statement made by Donald Lee. In this statement Mr. Lee claims that Defendant Kamal Thomas voluntarily confessed to the murder of James Patrick Cockayne. As a result, Defendant Jahlil Ward claims that: (i) he did not have knowledge of the evidence prior to January 9, 2009; (ii) no amount of diligence would have disclosed the evidence prior to trial; and (iii) the evidence is material and likely to produce an acquittal if presented at a new trial. Defendant thereafter requested that the Court order a hearing at which testimony may be taken and evaluated in order to determine its likely impact at a new trial. In response, the Court scheduled an evidentiary hearing for Friday, April 17, 2009 at 9:00 a.m., Courtroom I.

This matter came on for an evidentiary hearing on Friday, April 17, 2009. At this hearing, the Court heard sworn testimony from Deputy Marshal Rodney Arthurton and determined notwithstanding the assertions of Mr. Donald Lee, a material witness for Defendant Jahlil Ward, that Defendant Kamal Thomas was not at the location alleged on the date asserted. Specifically, given the sworn testimony of Deputy Marshal Rodney Arthurton, this Court found Mr. Donald Lee's assertions regarding Defendant Kamal Thomas' alleged confession unpersuasive. Thereafter, the Court heard from Neil Sprauve, Defendant Jahlil Ward's cousin. Mr. Neil Sprauve testified to having allegedly overheard Defendant Kamal Thomas confess to being involved in the murder of James Patrick Cockayne. Mr. Sprauve further stated that he refrained from coming forward with this exculpatory evidence out of fear of being labeled a "snitch." However, Mr. Sprauve abandoned all such fear after his cousin, Defendant Jahlil Ward, was convicted for the murder of James Patrick Cockayne. For these reasons, the Court finds Mr. Neil Sprauve's testimony incredible. Therefore, the Court denies Defendant Jahlil Ward's Motion for a New Trial dated January 12, 2009.

## C. The People Committed A *Brady v. Maryland* Violation When They Failed To Turn Over the Statement Of Daryl G. Martens That Implicated Defendant Kamal Thomas As The Murderer Of James Patrick Cockayne.

■ After the U.S. Supreme Court in *Brady v. Maryland* reinforced the mandate of due process and required the government to disclose favorable evidence to defendants, prosecutors still fail to perform this duty. *Id*. As a result, such prosecutorial misconduct violates the Fifth and Fourteenth Amendments and thwarts a defendant's fundamental right to a fair trial under the Sixth Amendment to the U.S. Constitution. The Fifth, Fourteenth and Sixth Amendments to the Constitution of the United States are made applicable to the U.S. Virgin Islands pursuant to Section of the Revised Organic Act of 1954.[7]

■ Although the prosecutor's duty of disclosure is tightly tethered to constitutional guarantees of due process, the "Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." *Government of the Virgin Islands v. Fahie*, 304 F. Supp. 2d 669, 674, 45 V.I. 475 (D.V.I. 2004). *See also Government of the Virgin Islands v. Fahie*, 419 F.3d 249, 255 (3d Cir. 2005). Rather, a prosecutor's failure to disclose evidence violates due process "only if the government's evidentiary suppression undermines confidence in the outcome of the trial. *Fahie*, 304 F. Supp. 2d at 674. Simply put, the primary issue is whether the prosecutor's suppression of evidence allowed the *defendant to receive fair trial resulting in a verdict worthy of confidence. Id. See also Smith v. Holtz*, 210 F.3d 186, 195-197 (3d Cir. 2000). This inquiry naturally demands a distinction between *Brady* material and a *Brady* violation.

■ The U.S. Supreme Court has clarified the distinction between *Brady* material and a *Brady* violation. *Fahie*, 304 F. Supp. 2d at 674. In *Strickler v. Greene*, 527 U.S. 263, 281-282, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999), the U.S. Supreme Court pronounced three (3) components of a *true* [emphasis added] *Brady* **violation**: (i) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it

---

[7] The complete Revised Organic Act of 1954 is found at 48 U.S.C. §§ 1541-1645 (1995), reprinted in the V.I. Code Ann., Historical Documents, Organic Acts, and the U.S. Constitution at 73-177 (1995) (preceding V.I. Code Ann. tit 1).

is impeaching; (ii) that evidence must have been suppressed by the State, either willfully or inadvertently; and (iii) prejudiced must have ensued. *Id.* *See also Fahie*, 304 F. Supp. 2d at 674. In contrast, ***Brady* material** is evidence that is favorable to the accused because it is either exculpatory or impeaching and "is material *only if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different.* A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 678, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). *See also Fahie*, 304 F. Supp. 2d at 675.

In *United States Agurs*, 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976), the court described three (3) different situations of prosecutorial nondisclosure and framed a different standard for determining materiality in each situation. *Id*. The first is an instance involving "a corruption of the truth-seeking function of the trial process," by prosecutorial misconduct as when the prosecution's case includes perjured testimony and the prosecution knew, or should have known, of the perjury. *Agurs*, 427 U.S. at 106. Recognizing that a conviction obtained by the knowing use of perjury is fundamentally unfair, the court stated such a verdict must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id*. This was described as a "strict standard of materiality." *Id*.

The second situation arises when the defendant has made a specific request for information and the prosecution has failed or refused to respond to the request, as occurred in Brady. Non-response by the prosecutor in such a case, the Court found, "is seldom, if ever, excusable." *Agurs*, 427 U.S. at 106. Evidence will be deemed material if the suppressed evidence might have affected the outcome of the trial." *Agurs*, 427 U.S. at 106.

Thirdly, when no request is made by defendant or only a general request is made, information not revealed by the prosecutor will he held to be material only if "the omitted evidence creates a reasonable doubt that did not otherwise exist." *Agurs*, 427 U.S. at 112. The court stressed that the "omission must he evaluated in the content of the entire record."

In the case *sub judice*, the Court is confronted with the second and third categories of nondisclosure. Notwithstanding Defendant Jahlil Ward's demand for *Brady* material during discovery, the People failed to turn over a statement by an individual named Daryl G. Martens where Martens

contended that Defendant Kamal Thomas confessed to the murder of James Patrick Cockayne while both men were incarcerated at the Bureau of Corrections. Even though, the People were obviously going to use this evidence against Defendant Kamal Thomas before Defendant Jahlil Ward was arrested, the People nonetheless failed to turn over the statement to counsel for Defendant Jahlil Ward despite pre trial demands and the fact that the statement was clearly *Brady* material, exculpatory and favorable to Defendant Jahlil Ward.

▉ Given the foregoing, the Court finds that the People committed a *Brady* violation when it failed to turn over Daryl Martens' statement implicating Defendant Kamal Thomas as the murderer of James Patrick Cockayne. Undeniably, Defendant Jahlil Ward had no meaningful opportunity to utilize this crucial evidence that someone else confessed to the murder of James Patrick Cockayne and that the *Brady* materiality standard has been met. Not only did the prosecution's failure to disclose Daryl G. Martens' statement to Defendant Jahlil Ward's counsel violate due process, but it also further undermines confidence in the outcome of the trial.

▉ In its Response to the Court Order dated May 27, 2009, the People disingenuously categorized their failure to disclose Daryl Martens' statement as mere oversight and harmless error, if any. Even if the failure to disclose Martens' statement was an oversight, a *Brady* violation can occur even if the omission is made in good faith and was not deliberate and/or intentional. The People's Responses to the Court's Order dated May 27, 2009 were as follows:

> **Q1: Why did counsel for the People so readily admit in April 2009 their failure to turn over to counsel for Defendant Jahlil Ward a copy of Daryl G. Martens' (hereinafter "Mr. Martens") statement?**

> **A: When counsel for the People realized before the April 17, 2009 hearing for the newly discovered evidence that Jahlil Ward's counsel did not mention Mr. Martens' name on his praecipes, we turned over the statement, Attorney Quinn submitted a praecipe for Donald Lee and subsequently another praecipe for Neal Sprauve and Allan de Groot. All three witnesses were incarcerated at some point during the pendency of this case. Counsel inquired**

of Attorney Quinn as to whether he was going to use Mr. Martens because Mr. Martens was also incarcerated when Defendant Thomas was incarcerated, but Attorney Quinn indicated he was not familiar with Mr. Martens. Then we realized after checking the file, that he did not receive the statement and then we turned over a copy.

Q2: What factors caused the People and/or their investigators to indirectly believe that Mr. Martens had inculpatory evidence against Defendant Jahlil Ward[8]?

A: Initially, no factor(s) caused the People to believe indirectly that Mr. Martens had inculpatory evidence against Jahlil Ward because there was a lot of hearsay, rumors, innuendos, and speculation about this case and Mr. Martens' voluntarily went to the Cockayne family. The Cockayne family's attorney contacted Agent Al Schmidt of the FBI because apparently Mr. Martens did not want to speak to any local person, only a White person. Thus, we dismissed it as gossip. Also Mr. Martens' credibility was questionable particularly since he would be considered a "jail house" snitch and subject to defense tactics utilized with regard to "jail house" snitches. Eventually, we decided to accept the information he provided and present it at trial although we did not think it was compelling.

Q3: Where did the People's/investigator's interview with Mr. Martens take place? When?

A: Agent Schmidt did not interview Mr. Martens and he did not prepare an FBI 302 written statement because he thought the information was hearsay. Agent Schmidt did prepare the document that was turned over in discovery. No other investigator interviewed Mr. Martens.

Q4: Who did the interview with Mr. Martens?

---

[8] The Court inadvertently referred to Defendant Jahlil Ward in Question No. 2 of its Order issued on May 27, 2009 instead of Defendant Kamal Thomas in the aforesaid question.

A: Mr. Martens voluntarily came to the Office of the Attorney General and undersigned counsel did speak to Mr. Martens in her office sometime during Fall 2007.

Q5: Was there anything offered to Mr. Martens regarding his pending criminal case in exchange for his cooperation in the Boston/Thomas murder trial? If so, what?

A: The People did not offer anything to Mr. Martens regarding his criminal case in exchange for his cooperation in the Boston/Thomas murder trial. When Mr. Martens came to the Office of the Attorney General, he was already released from prison on a misdemeanor charge.

Q6: When did counsel for the People first discover their omission of Mr. Martens' statement?

A: The People first discovered their omission of Mr. Martens' statement in April 2009, when the undersigned was speaking to Attorney Quinn and he indicated he had not heard about Mr. Martens after the undersigned inquired as to whether he was going to call Mr. Martens and Ms. Safford to testify at the evidentiary hearing to be held on April 17, 2009.

Q7: What was the catalyst that caused the People to turn over Mr. Martens' statement to Defendant Jahlil Ward on/after April 14, 2009?

A: Same as Response 6.

Q8: How did counsel for the People come to acknowledge that Mr. Martens' statement was not included in the papers that were turned over to counsel for Defendant Jahlil Ward during discovery?

A: Same as Response 6, as it was during the conversation with Attorney Quinn. Counsel reviewed the discovery papers and realized the statement was not in the discovery documents.

Q9: Was Mr. Martens' statement at all times in the box or boxes allegedly made available to counsel for Defendant Jahlil Ward? If

96

so, why was it not copied and turned over to counsel for Defendant Jahlil Ward before trial?

A: Yes, Mr. Martens' statement was in the box at all times from when we received it from Agent Schmidt. It was not copied and turned over to Defendant Ward because it was a complete oversight on the undersigned counsel's part. Based on the assessment of the information, it was not viewed as strong evidence, of questionable credibility, and with the voluminosity of the file, overlooked the significance of the *Brady* import. Counsel is fully aware of her *Brady* obligation, however it was an oversight and in this respect, harmless error.

Q10: When did counsel for the People decide to use Mr. Martens as a witness and placed his name on the People's witness list?

A: Undersigned counsel does not know specifically when she decided to use Mr. Martens as a witness. He was not intended to be called initially, however, we placed Mr. Martens' name in the People's pre-trial memorandum dated May 1, 2008, so we had intended to call him at least by that time.

Q11: Who were the witnesses that the People planned to use before Defendant Jahlil Ward's arrest to establish beyond a reasonable doubt that the person who stabbed James Patrick Cockayne was Defendant Kamal Thomas?

A: The People had planned to use Ms. Leann Oquendo, Mr. Kenny Rawlins, Mr. Lionel Sprauve, Mr. Daryl Martens' and Ms. Amy Safford.

Q12: When did counsel for the People decide to forego using Mr. Martens as a witness? Why?

A: The People never intended to forego using Mr. Martens' as a witness. The People sent a praecipe for him to appear for the trial on October 7, 2008. However, the People never saw him at the trial and drew the conclusion that he was not there and proceeded with the witnesses present.

97

**Q13:** Who was the active participant in the stabbing of James Patrick Cockayne before Defendant Jahlil Ward's arrest?

**A:** There was no active participant in the stabbing of James Patrick Cockayne before the arrest of Jahlil Ward. Investigation kept showing that a third person was the active participant. That third person was believed to be suspect Jahlil Ward. During the investigation, we were told that the Government had already sent him off-island, but the Government did not have any proof of his involvement in the homicide until May/June 2008.

**Q14:** Which of the three (3) Defendants most closely matched the following description given by Witness No. 1 in Detective/Corporal Mario Stout's Affidavit for Defendant Kamal Thomas' arrest when Witness No. 1 describes seeing "a black individual . . . running out from behind the wall, . . . being 130-140 lbs, about 510, very young and skinny with a white shirt around *his* neck?"

**A:** Jahlil Ward most closely fits the description. See the following responses.

**Q15:** How old were the Defendants on June 19, 2007?

**A:** Based on the arrest reports:

> Jahlil Ward was 19 years old. He was born on October 22, 1987.
> Kamal Thomas was 18 years old. He was born on February 12, 1989.
> Anselmo Boston was 30 years old. He was born on June 29, 1976.

**Q16:** What were the approximate heights of the Defendants on June 19, 2007?

**A:** Based on the arrest reports:

> Jahlil Ward's approximate height is 54
> Kamal Thomas' approximate height is 54
> Anselmo Boston's approximate height is 60

98

**Q17:** What were the approximate weights of the Defendants on June 19, 2007?

**A:** We do not have a record of Jahlil Ward's approximate weight on June 19, 2007. However, the medical record for Jahlil Ward (April 2006) shows his weight as 150 lbs. (see attached)
Kamal Thomas' approximate weight at that time was 120 lbs.
Anselmo Boston's approximate weight at that time was 185 lbs.

**Q18:** When was Defendant Jahlil Ward shot by Denzil Stevens?

**A:** Defendant Jahlil Ward was shot by Denzil Stevens on April 7, 2006.

**Q19:** When was Defendant Jahlil Ward released from the hospital?

**A:** Defendant Jahlil Ward was released from the hospital on April 14, 2006.

**Q20:** When did Defendant Jahlil Ward testify as a witness for the People in the Denzil Stevens matter?

**A:** Defendant Jahlil Ward testified for the People on or about September 18, 2007, in the Denzil Stevens matter.

**Q21:** Did the People subsidize Defendant Jahlil Ward's trip off-island after he testified in the Denzil Stevens matter? If so, what was the remuneration?

**A:** Yes. The Department of Justice paid a one-way ticket to New York for Mr. Ward after he testified in the trial. The cost of the ticket was $439.60. See the attached.

**Q22:** Was the financing of Defendant Jahlil Ward's off-island departure part of an agreement for his testimony on behalf of the People in the Denzil Stevens matter?

**A:** No. The financing of the trip was not part of any agreement for his testimony in the matter of the *People v. Denzil Stevens*. Jahlil

Ward was sent off-island after the trial and after be said he was fearful for his life and the Government's investigation of the threats.

Q23: When did Defendant Jahlil Ward leave the U.S. Virgin Islands?

A: Jahlil Ward left the U.S. Virgin Islands on September 22, 2007.

Q24: Was there any information received as a result of the People's investigation following the murder of James Patrick Cockayne that Defendant Jahlil Ward was involved in the murder of James Patrick Cockayne? If so, when was the information received?

A: On June 19, 2007, the same day of the homicide, Detectives Stout and K. Hodge spoke to Jahlil Ward about the murder of James Cockayne and Defendant Ward provided detailed information to the detectives. See the attached Supplemental Blue Sheet dated July 31, 2007.

On July 16, 2007, Detective Phipps, Detective Stout and Sergeant Hill traveled to J-1 Gifft Hill, St. John, VI to Jahlil Ward's home and Ward's sister said he was not at home. See attached Supplemental Blue Sheet dated July 16, 2007.

On July 17, 2007, Detective Phipps contacted Jahlil Ward's mother in an attempt to speak to her son. He was unable to contact Jahlil Ward, See the attached Supplemental Blue sheet dated July 17, 2007.

On July 17, 2007, Detective Phipps and Stout made contact with Ms. Leann Oquendo. Ms. Oquendo said Jahlil Ward asked her daughter why was her mother (Ms. Oquendo) blowing her car horn the night of the homicide. Ward wanted to know what was wrong with Ms. Oquendo. Ward denied being present at the crime scene when he found out Ms. Oquendo did not recognize him. See the attached Supplemental Blue Sheet dated July 18, 2007.

On September 26, 2007, Corporal Bedminster showed Kenneth Rawlins a photo array wherein Mr. Rawlins said photo no. 4 re-

sembles the third person that he saw at the Front Yard Bar but he was not sure. See the attached Supplemental Blue Sheet dated September 27, 2007.

Q25: Was Defendant Jahlil Ward contacted before June 20, 2008, the date the warrant was issued for his arrest regarding the murder of James Patrick Cockayne? If so, when and where? If not, why not?

A: While he was in the witness protection program, Jahlil Ward was in contact, by phone, with Special Agent William Curtis before June 20, 2008; however the discussions were about the Defendant's desire to return to the Virgin Islands for St. John Carnival. Contact was made during the first week of June 2008.

Q26: How did Defendant Jahlil Ward come to return to St. Thomas/St. John on June 27, 2008?

A: Jahlil Ward returned to the Virgin Islands on June 27, 2008 because he wanted to return for carnival and Agent Curtis arranged the ticket and other matters for him to return to the Virgin Islands.

Q27: Did the People pay for Defendant Jahlil Ward to return to St. Thomas/St. John on June 27, 2008? If so, how much?

A: The People paid for a one-way ticket for Jahlil Ward from Orlando, Florida on June 27, 2008, in the amount of $5630.00. See the attached.

Q28: Was Defendant Jahlil Ward, at any time before June 20, 2008, informed that he was wanted for questioning and/or arrest in connection with the murder of James Patrick Cockayne?

A: To the best of the People's knowledge, the Defendant was not told by the authorities that he was wanted for questioning and/or arrest in connection with the murder of James Patrick Cockayne.

Q29: Was Defendant Jahlil Ward extradited?

**A: Defendant Ward was not extradited.**

**Q30: Did Defendant Jahlil Ward waive extradition proceedings and voluntarily submitted to the jurisdiction of the United States Virgin Islands on June 27, 2008?**

**A: There was no waiver of extradition proceedings. Defendant Ward wanted to return to go to the St. John Carnival and upon arrival at the Cyril E. King Airport, he was served with the arrest warrant.**

**Q31: Did Defendant Jahlil Ward know that an arrest warrant was executed on June 20, 2008 when he returned to St. Thomas/St. John on June 27, 2008?**

**A: We do not know if Defendant Ward knew that an arrest warrant was executed on June 20, 2008 upon his return.**

The People's responses are particularly disconcerting given the following timeline of events:

- On or about April 7, 2006 — Shooting of Darcy Thomas by Defendant Jahlil Ward.
- On or about April 8, 2006 — Denzil Stevens shot Defendant Jahlil Ward.
- April 14, 2006 — Defendant Jahlil Ward released from hospital.
- On or about April 25, 2006 — Defendant Jahlil Ward arrested for shooting Darcy Thomas.
- On or about April 26, 2006 — Defendant Jahlil Ward released on an unsecured bond.
- On July 14, 2006 — Defendant Jahlil Ward pled guilty to unauthorized possession of a firearm (Count V of an Amended Information).
- On or about August 17, 2006 — Defendant Jahlil Ward was sentenced to five (5) years all suspended except for fifteen (15) months with one (1) month and five (5) days credit for time served.
- On or about June 2, 2007 — Bureau of Corrections illegally released Defendant Jahlil Ward from incarceration

102

in violation of the Judgment and Commitment and applicable law.

- June 19, 2007 — Murder of James Patrick Cockayne.
- June 19, 2007 — Defendant Jahlil Ward subpoenaed and the People's first investigation/interrogation of Defendant Jahlil Ward occurred.

 Defendant Jahlil Ward appeared pursuant to a subpoena, where he was apparently not advised of his rights and indicated he "don't want to give any statement." However, be subsequently admitted during interrogation that he was present at the Front Yard Bar in St. John, Fashion Palace, and the vicinity of Dolphin Market, and stated that he saw the "white guy" on June 19, 2007 (According to No. 13 of the People's Response to Court Order dated May 27, 2009, the People contends that Defendant Jahlil Ward *was always believed to be a suspect in the murder of James Patrick Cockayne*).

- July 16, 2007 through July 17, 2007 — Attempts by the People to locate Defendant Jahlil Ward. The attempts were unsuccessful. The attempts to locate Defendant Jahlil Ward ironically never included the Bureau of Corrections.
- July 31, 2007 — Interrogation of Defendant Jahlil Ward on June 19, 2007 finally reduced to writing.
- August 1, 2007 — Warrants issued for Defendant Anselmo Boston and Defendant Kamal Thomas.
- August 3, 2007 — Defendant Kamal Thomas arrested.
- August 9, 2007 — Defendant Anselmo Boston arrested.
- August 13, 2007 thru August 30, 2007 — Daryl G. Martens incarcerated for domestic violence.
- September 12, 2007 — Counsel for the People interviewed Daryl G. Martens at the Attorney General's Office and Martens became the People's indispensable witness against Defendant Kamal Thomas.
- September 18, 2007 — Defendant Jahlil Ward testified in Denzil Stevens prosecution.

103

- **September 22, 2007** — Defendant Jahlil Ward left/departed Territory (departure financed by the People) ostensibly placed in the Witness protection Program.
- **October 2007** — Defendant Jahlil Ward's participation in the Witness Protection Program was closed.
- **April 21, 2008** — Attorney Michael Joseph filed a Notice of Appearance as counsel for Defendant Kamal Thomas.
- **June 2008** — Contact was made between Special Agent Williams Curtis, Jr. and Defendant Jahlil Ward, at which time Ward requested to return to the Territory for the St. John Carnival. The Department of Justice sent Defendant Jahlil Ward a First Class ticket to return, albeit a convicted felon and no longer a participant in the Witness Protection Program.
- **June 20, 2008** — Warrant issued for Defendant Jahlil Ward's arrest as per the People's request.
- **June 27, 2008** — Defendant Jahlil Ward returned to Territory, was arrested and charged for *inter alia* first degree murder of James Patrick Cockayne.

Although the People insist that there was no *quid pro quo* for Defendant Jahlil Ward's testimony in the Denzil Stevens' prosecution,[9] Defendant Jahlil Ward was inexplicably and prematurely released from the Bureau of Corrections on or about June 2, 2007. Defendant Jahlil Ward's illegal release conveniently occurred prior to the time he was scheduled to testify in the Denzil Stevens matter and while he was resisting giving such testimony,[10] To "sweeten the pot," Defendant Jahlil

---

[9] Response No. 22 to the Court's Order dated May 27, 2009.

[10] According to the Judgment and Commitment dated August 28, 2006 and entered August 29, 2006, Defendant Jahlil Ward was sentenced in the matter docketed F168/2006 for Count V of the Amended Information, to wit: Unauthorized Possession of a Firearm, in violation of V.I. CODE ANN. tit 14 § 2253(a), as follows: Five (5) years incarceration with all suspended except for *fifteen (15) months*. Defendant Jahlil Ward was also given one (1) month and five (5) days credit for time served. Of great significance, Defendant Jahlil Ward's Sentence included a statutory mandatory term of twelve (12) months and as such, even with the Application of "good time" credits, he was not authorized to be released and/or paroled on or about June 2, 2007.

On Monday, July 27, 2009, this matter came on for a hearing at which time the People were ordered to answer another set of inquiries by the Court regarding Defendant Jahlil

Ward was placed in the People's Witness Protection Program and given a $439.60 ticket to travel "one-way" (arguably First Class) to New York, but only *after* [emphasis added] he testified in the Denzil Stevens' prosecution. Strangely, this new brand of "witness protection" afforded the threatened witness the right to return to the very location from which he fled and was fearful for his life via a $630.00 "one-way" ticket (again, arguably First Class) to celebrate the St. John Carnival festivities in June 2008.

By the People's account, it was a mere coincidence that two (2) months before financing Defendant Jahlil Ward's trip back to the Virgin Islands, Attorney Michael Joseph, as the newly retained counsel for Defendant Kamal Thomas, launched an aggressive and relentless investigation that yielded the theory that Defendant Jahlil Ward, acting alone, murdered James Patrick Cockayne. Shortly after Attorney Joseph shared this theory with counsel for the People, the prosecutors filed for and were issued an arrest warrant for Defendant Jahlil Ward. Upon his arrival at the Cyril E. King airport in St. Thomas, Defendant Jahlil Ward was arrested. At this point, it was obvious that counsel for the People completely abandoned the idea of using Daryl G. Martens as a key witness to substantiate its initial theory that Defendant Kamal Thomas murdered James Patrick Cockayne,[11] and instead adopted Attorney Michael Joseph's theory "lock, stock and barrel" that Defendant Jahlil Ward alone murdered James Patrick Cockayne.

The People's contention that the failure to turn over Daryl Martens' statement to counsel for Defendant Jahlil Ward was an "oversight" appears to be disingenuous given the omission of Daryl G. Martens' name

Ward's release. Counsel for the people informed the Court that the People were unable to locate Ms. George, a prior Warden at the Bureau of Corrections and Mr. Rangle, a prior Custodian of Records at the facility. Both individuals worked in their aforesaid capacities during Defendant Jahlil Ward's 2006 incarceration.

At the hearing, the Court heard from Ms. Latoya Horsford, a Temporary Records Clerk at the Bureau of Corrections. According to Ms. Horsford, Defendant Jahlil Ward was sentenced and incarcerated on August 17, 2006. Ms. Horsford further stated that Defendant Jahlil Ward's Timesheet erroneously indicated that his term of incarceration was thirteen (13) months, thereby providing for his release on or about June 2, 2007. The Court also heard testimony from Special Agent William A. Curtis, who stated he was unaware of the circumstances surrounding Defendant Jahlil Ward's premature release.

[11] The People listed Daryl G. Martens, as a key witness against Defendant Kamal Thomas since September 12, 2007.

on the People's September 15, 2008 praecipe of witnesses; Mr. Martens' absence during jury selection on Friday, October 3, 2008; the People's failure to inform the Court of Mr. Martens' absence during jury selection; Mr. Martens' absence on Monday, October 6, 2008, the day trial began; the late special request on Monday, October 6, 2008 to have a subpoena "rushed" in order to serve Dalyl Martens and have him appear on Tuesday, October 7, 2008; and the People's response to No. 12 of the Court's inquiries stating that the People never saw Daryl Martens at trial, never looked for him, assumed he was not present and proceeded without him.[12]

The People's failure to actively pursue and secure Daryl Martens as a key witness is particularly troubling because at this point, Daryl Martens had already voluntarily contacted the victim's family attorney, spoken to an FBI special agent along with the Attorney General's first-chair, Renee Gumbs-Carty, and had his statement implicating Defendant Kamal Thomas as the murderer of James Patrick Cockayne reduced to writing. Moreover, Daryl Martens, according to his statement, while incarcerated with Defendant Kamal Thomas at the Bureau of Corrections, heard Defendant Kamal Thomas confess to murdering James Patrick Cockayne. Curiously, a search of the record thus far fails to disclose that Martens' statement was ever turned over to counsel for Defendants Kamal Thomas or Anselmo Boston. Taken together, these facts and events tend to dispel the People's contention that they never intended to forego using Daryl G. Martens as a witness. According, the failure of the People to turn over the statement of Daryl Martens to counsel for Defendant Jahlil Ward, whether intentional or not, was a material *Brady v. Maryland* violation, hence requiring a new trial.

**D. There Is No Sanction Available Other Than A New Trial When A Material *Brady* Violation Is Discovered After Trial.**

 The United States Supreme Court recognizes the serious impact of a prosecutor's failure to disclose *Brady* material. Addressing that transgression, sanctions have been established for *Brady* violations at various stages of a trial. In *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct.

---

[12] The people never inquired as to whether service was effectuated on Mr. Martens or, if served, whether a warrant could be issued to assure his attendance. Furthermore, on Tuesday, October 7, 2007 the People rested.

1194, 10 L. Ed. 2d 215 (1963), the U.S. Supreme out held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, **irrespective of the good faith** or bad faith of the prosecution. *Brady* at 373 U.S. at 87. Here, a court is required to implement certain remedies when the violation occurs and is material. These remedies may differ depending upon whether the *Brady* violation occurs *prior to trial or after a verdict is rendered.*

██ ██ If a *Brady* violation occurs *prior to trial,* a trial court has the discretion to grant a mistrial,[13] a short continuance or parse another avenue of relief *other* [emphasis added] than dismissal. *Fahie,* 304 F. Supp. 2d at 677 (D. V.I. App. Div. 2004). *See also Government of the Virgin Islands v. Fahie,* 419 F.3d 249, 255 (3d Cir. 2005); *Government of the Virgin Islands v. Ubiles,* 317 F. Supp. 2d 605 (D.V.I. 2004) (*stating* "trial judge abused his discretion in imposing the most severe sanction, dismissal with prejudice"). On the other hand, if a material *Brady* violation occurs *after the close of trial,* the remedy of a new trial is inescapable. *Fahie,* 419 F.3d at 255 (3d Cir. 2005). Indeed, new evidence discovered after the close of trial, if from a neutral sources results only in a new trial. *Id.* at 255. This is because a new trial completely cures any prejudice to a defendant from a *Brady* violation. *Id.*

██ Although recognizing the prevailing and/or preferred remedies for material *Brady* violations, the Court only became aware of the instant *Brady* violation approximately four (4) months after trial, when counsel for the People, in a correspondence directed to the attention of counsel for Defendant Jahlil Ward, conceded that through "oversight" she failed to disclose to him the statement of Daryl G. Martens and turned over said statement along with the letter. The Court was stunned, completely shocked and taken aback by this surprising turn of events. Given the material nature of the statement and the "due process" considerations, the only remedy available at this juncture for Defendant Jahlil Ward, absent outright dismissal, is a new trial.

## V. CONCLUSION

Because there was sufficient evidence adduced at trial to establish premeditation for first degree murder, Defendant Jahlil Ward's October

---

[13] A mistrial yields a new trial.

24, 2008 Motion for Judgment of Acquittal is **DENIED**. Furthermore, since (1) the jury's verdict was not against the weight of the evidence; (2) the Court did not make erroneous trial rulings which, within a reasonable probability, had a substantial influence on the jury's verdict; and (3) the Court did not abuse its discretion in denying Defendant's motion to continue, therefore Jahlil Ward's Motion for a New Trial on those grounds is also **DENIED**. However, with respect to Defendant Jahlil Ward's Motion for New Trial dated April 15, 2009 based upon the post trial disclosure of the statement by Daryl G. Martens, implicating Defendant Kamal Thomas as the murderer of James Patrick Cockayne, four (4) months after Defendant Jahlil Ward was convicted of *inter alia* murder in the first degree, the Court finds that the post trial disclosure was a *Brady* violation, the disclosure was material and, if produced in a new trial, is likely to produce an acquittal. Accordingly, a new trial is warranted and **GRANTED** in order to remedy the egregious *Brady* violation and to avoid a miscarriage of justice.